**Sheldon WULF, Plaintiff,**

**v.**

**The CITY OF WICHITA, Gene Denton, individually and as City Manager of the City of Wichita, and Richard LaMunyon, individually and as Chief of Police of the City of Wichita, Defendants.**

Civ. A. No. 81–1307.

United States District Court, D. Kansas.

July 24, 1986.

Karlin Church Lawing, and Jack Focht, Wichita, Kan., for plaintiff.

John Dekker, City Atty., Bernard V. Borst, First Ass't/City Atty., Robert L. Howard, Foulston, Siefkin, Powers & Eberhardt, Wichita, Kan., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND OPINION OF THE COURT

THEIS, District Judge.

This is a civil rights action in which the plaintiff, Sheldon Wulf, claims he was unlawfully terminated from his employment as a police officer with the defendant City of Wichita for exercising his First Amendment rights. The case was tried to the Court, commencing on February 3, 1986, continuing until February 13, 1986, recommencing on April 14, 1986, and concluding on April 17, 1986. The parties called twenty-three witnesses, read several depositions into the record and offered numerous exhibits. Each side has submitted post-trial briefs. After hearing all of the testimony, weighing and examining the credibility of all the witnesses, examining the exhibits admitted and reviewing the briefs of the parties, the Court is now prepared to enter judgment in this case pursuant to Rules 52 and 58 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. Plaintiff Sheldon Wulf is a white male. He was employed by the City of Wichita as a police officer from March 1, 1966, until his termination on April 21, 1981.

2. The City of Wichita is a municipality organized under the City Manager-City Commission form of government.

3. At all relevant times Gene Denton was the City Manager and the principal policy-maker for the City of Wichita. At all relevant times Richard LaMunyon was the Wichita Chief of Police. LaMunyon was the official policy-maker for the Wichita Police Department.

4. During his career as a police officer, Wulf was a good and competent employee. He was rated competent or outstanding in all annual evaluations. His police department file contains twenty letters of commendation. His personnel file contains no record of any misconduct or disciplinary action taken until April 21, 1981.

5. On October 30, 1976, Wulf was promoted to the rank of Master Detective by LaMunyon. On May 27, 1977, LaMunyon promoted Wulf to the rank of Lieutenant. Upon Wulf's promotion to the rank of Lieutenant, he became a member of management and a part of the supervisory team of the Police Department.

6. Wulf became a member of the Fraternal Order of Police in 1974. Beginning in 1976 and ending in December of 1977, he served as the President of the local F.O.P. Lodge of Wichita. He served as President of the state F.O.P. Lodge from May of 1978 to May of 1980. He was a member of the Executive Board of the state F.O.P. Lodge for eight years, inclusive of 1981.

7. There were problems between the F.O.P. and Chief LaMunyon. In September of 1978, approximately 160 police officers, including some members of the Wichita F.O.P., went on strike for one week. During the police strike, Officer Peter Dubovich went out and pretended to be on strike and then reported back to LaMunyon. After the strike ended LaMunyon admitted that his relationship with the F.O.P. was strained. Wulf was opposed to the strike and encouraged other F.O.P. members not to strike.

8. On September 24, 1979, the Wichita F.O.P. sponsored a stag party at the private club owned and operated by the local F.O.P. Lodge. The activities at the stag included a pornographic movie, nude dancing, gambling and state liquor law violations. LaMunyon testified that the stag party had a detrimental effect on the police department. LaMunyon ordered an Internal Affairs investigation of the events that occurred at the stag. Several officers were disciplined for misconduct associated with the stag party. Wulf did not attend the stag party.

9. LaMunyon has fired Larry Stats, Jim Cochran and Sheldon Wulf, all of whom were past or current presidents of the F.O.P. when they were terminated. LaMunyon testified that he was quoted correctly in a newspaper article dated November 22, 1981, as saying, "to say the relationship between current F.O.P. leadership and myself is strained is somewhat of an understatement. The fact of the matter is I don't speak to them." LaMunyon's testimony on the witness stand that he had a good relationship with the local F.O.P. is not credible and at best reflects his own subjective opinion.

10. On October 5, 1979, Wulf's attorney, Karlin Lawing, wrote to LaMunyon to complain that high ranking police officers had demanded that F.O.P. members resign their membership. The letter stated that Wulf had been told to resign his membership if he valued his career. The letter further informed LaMunyon that such conduct was impermissible under the First Amendment and various state laws.

11. LaMunyon received Lawing's letter. The only investigation he conducted into the merits of the letter was to ask eight staff personnel whether the conduct complained of was occurring, according to LaMunyon's testimony. Wulf requested permission through his chain of command to express his concern about the F.O.P. to his

Deputy Chief and the Chief of Police. He did not receive permission.

12. In August of 1980, Wulf was transferred to the Records Department. LaMunyon testified that Wulf's transfer was a lateral transfer, although he admitted that such transfers are sometimes used in the police department as punishment. Wulf testified that he believed his transfer was punitive. Wulf's reputation was as a street cop. By its nature, records primarily involved paperwork. Captain Floyd Powell testified that Wulf was weak in paperwork. Troy Hampton testified that he suggested the transfer because of Wulf's age, experience and prior injuries. Wulf's personnal records indicate only two absences due to illness or injury. Wulf was listed as the only lateral transfer on the City's personnel change form. Wulf's attorney wrote a letter of complaint concerning his transfer. LaMunyon neither investigated the complaint nor answered the letter.

13. Wulf testified that following the September 29, 1979, stag party, many officers complained to him about LaMunyon's treatment of the F.O.P. Wulf kept notes of these conversations concerning the F.O.P. Other officers were aware that Wulf was keeping notes.

14. In January of 1981, plaintiff's wife, Mary Wulf, inquired at the Attorney General's office about how to start an investigation into possible "union-busting" actions on the part of the Chief of Police. Carl Buck, an attorney, advised the Wulfs to write a letter to the Attorney General. Sheldon Wulf prepared a letter to the Attorney General requesting an investigation of various matters concerning the Wichita Police Department. Wulf's letter contained the following allegations:

(a) Chief LaMunyon was attempting to dissolve the Fraternal Order of Police;

(b) LaMunyon selectively prosecuted F.O.P. members for liquor, gambling and narcotics violations;

(c) LaMunyon exempted himself from a proper investigation regarding the possible misappropriation of City funds;

(d) LaMunyon permitted the use of taxpayers' money to fund mailings of the Wichita Christian Police Officers' Association; and

(e) A staff member was sexually harassing a subordinate employee.

15. Evidence was presented at trial concerning the validity of the allegations contained in Wulf's letter. Wulf established that superior officers gave orders and/or suggestions that patrolmen terminate their F.O.P. membership. Furthermore, the evidence indicated that these suggestions of membership withdrawal originated with LaMunyon or, at least, came with his knowledge and approval. Lieutenant J.D. Malter, Lieutenant Pat Glynn and Captain Virgil Ternes all testified that they were told by superior officers that it would be in their best interests to get out of the union. As a result of these conversations, Malter, Glynn and Ternes resigned from the F.O.P. Lieutenant Harold Holtz testified that his superior, Captain Troy Hampton, handed Holtz a resignation form to induce him to resign from the union. Holtz resigned his membership the same day. Hampton testified and denied that he had handed the resignation form to Holtz. The Court finds Hampton's testimony not credible.

16. Lieutenant John Dotson testified that shortly after the stag party his immediate supervisor, Captain Kerry Crisp, called Dotson at his part-time job and inquired whether Dotson was a member of the F.O.P. Crisp corroborated that he had called Dotson to ascertain how active Dotson was in the F.O.P. Crisp also testified that he had intended to call Lieutenant John Garrison regarding his F.O.P. membership, but he did not remember whether he had called. Crisp testified that he, his Major, Charlie Hicks, and his Deputy Chief, William Cornwell, all felt concern about a conflict of interest between membership in the F.O.P. and employment in management.

17. Wulf testified that Floyd Powell informed him that it would be better for

Wulf's career if he resigned from the F.O.P. Powell testified that his superior officer suggested that he talk to his lieutenants about resigning from the F.O.P.

18. Wulf testified regarding a decline in F.O.P. membership. In 1979, the F.O.P. had 283 members; in 1980, there were 173 members; in 1981, there were 134 members. A comparison of promotions and union dues cancellations shows that a number of officers dropped their F.O.P. memberships either shortly before or after a promotion.

19. Two out of three Deputy Chiefs, the highest ranking members of the police department under LaMunyon, were used as sources by Captains to encourage Lieutenants to leave the F.O.P.

20. Lieutenant Harold Holtz testified that he participated in a conversation on October 4, 1979, between several lieutenants and Captain Troy Hampton in which Hampton communicated an order from Chief LaMunyon that captains were to resign from the F.O.P. Hampton testified that he made no suggestions to the lieutenants about their F.O.P. membership during this conversation. He admitted, however, that he might have participated in a conversation concerning captains' memberships in the F.O.P.

21. On October 4, 1979, in a KSN News broadcast, LaMunyon stated that he knew officers of his were discouraging F.O.P. membership.

22. Wulf alleged in his letter to the Attorney General that surveillance of the F.O.P. club was conducted. Officer Kent Myers testified that he observed Lieutenant Gary Newton parked in a City car facing the F.O.P. club on a Saturday morning. Newton testified that he was not engaged in surveillance, but admitted that his usual work hours were 8:00 a.m. to 5:00 p.m. during the week and that he only drove a police car while on duty.

23. A cumulative and fair reading of the evidence concerning LaMunyon's poor relations with the F.O.P., surveillance of the F.O.P. club, firing of F.O.P. presidents and attempts to persuade F.O.P. members to resign indicates that LaMunyon endeavored to dissolve the union.

24. In his letter, Wulf alleged unequal treatment of the F.O.P. club. Former Deputy Chief William Cornwell testified that he ordered Lieutenant John Dotson to check on the F.O.P. club at least once a day. Cornwell also testified that checks on other private clubs were left to the beat officer's discretion. LaMunyon admitted that the F.O.P. club was treated differently than most other clubs.

25. Officer Bernie Drowatzky testified that he was ordered by Captain Kohler of Internal Affairs to make a written report concerning possible F.O.P. club violations. Drowatzky testified that he submitted such a report to LaMunyon, although LaMunyon testified that he received no written report. The Wichita Police Department's policy on a first violation of liquor laws by a private club was to issue a warning. The charges against the F.O.P. club were its first offense. LaMunyon took drastic disciplinary action in regard to the F.O.P. stag party, while prosecutions were not filed in a number of other cases involving violations of liquor and gambling laws.

26. Wulf's letter expressed concern about the handling of an incident regarding an alleged drug buy from Deputy Chief Coffey's son. Lieutenant George Barnes testified that he bought "white crosses" from Coffey's son which turned out not to contain any controlled substance. While there was no basis to pursue criminal charges, Barnes and Lieutenant Pay Glynn both testified they could find no records concerning the incident. The day after the buy, Barnes briefed several officers, including Coffey and LaMunyon, on the incident. LaMunyon admitted it was improper to inform an officer that his son was being investigated in relation to a drug case.

27. In the letter to the Attorney General, Wulf alleged that LaMunyon exempted himself from taking a polygraph test concerning the use of undercover funds to repay a victim. LaMunyon testified that Officer Oswald wrongfully took money

from a citizen's billfold. LaMunyon used money from the police undercover fund to reimburse the citizen. Subsequently, the fund was reimbursed from the officer's paycheck. LaMunyon told Chief Deputy Coffey to tell the press that LaMunyon had paid the money out of his own pocket. LaMunyon testified that then District Attorney Vern Miller did not investigate the matter. Miller testified that Coffey had called him to report that LaMunyon had used drug funds to repay the victim of a police officer's theft. Miller called LaMunyon and was told by LaMunyon that he had personally reimbursed the victim. Miller stated that if he had known that LaMunyon had taken the money from the drug fund, he would have had to file charges against LaMunyon. LaMunyon testified that he was not required to take a polygraph examination, since the department had no policy which covered the situation. However, LaMunyon admitted that the remainder of the allegations in Wulf's letter regarding this incident were substantially correct.

28. The fourth contention in Wulf's letter was that LaMunyon had used tax monies to pay for printing and postage costs for announcements of meetings of the Christian Police Officers Association ("CPOA"). There is no dispute that it was inappropriate for public funds to be used for this purpose. The funds were reimbursed to the City by the CPOA. Wulf's allegation was accurate.

29. Wulf's final allegation was that Major Troy Hampton had sexually harassed Detective Jan McCloud. Wulf testified that he had observed such an incident and that he had telephoned McCloud about it. McCloud testified that Wulf had called her, but denied that any incident of sexual harassment had occurred. Wulf testified that during the phone conversation McCloud had admitted there were many such incidents but had said that she did not want to pursue the matter. Hampton testified that he had teased McCloud, but denied that the incident was sexual in nature.

30. The Court finds that the allegations contained in Wulf's letter to the Attorney General were substantially correct.

31. LaMunyon first heard about the existence of Wulf's letter from Captain Kerry Crisp in January of 1981. Crisp informed LaMunyon that Peter Dubovich had information that Wulf was writing a letter about LaMunyon to the Attorney General. Crisp testified that LaMunyon called the Attorney General and was told that no letter had been received.

32. LaMunyon, Crisp and Dubovich met sometime in February of 1981 to discuss the letter. At the meeting, Dubovich told LaMunyon that he had seen the letter and that he knew it had been sent to the Attorney General. Dubovich informed LaMunyon about the contents of the letter. Dubovich testified that LaMunyon said, "If that's the case, I'll have his ass." LaMunyon denied making this statement, but admitted that he probably said something to indicate that he was upset. LaMunyon directed Crisp to let him know if he heard anything more about the letter. Crisp testified that LaMunyon told him to obtain a copy of the letter. Crisp further stated that he told Dubovich to find a copy of the letter, through subterfuge, if necessary. Dubovich testified that Crisp told him if he could obtain a copy of the letter his actions would be viewed favorably at promotion time.

33. LaMunyon testified that he received a copy of Wulf's letter at home near the end of March, and that he received another copy in a plain envelope at his office. Former Deputy Attorney General, Tom Haney, testified that he mailed one copy of the letter to LaMunyon.

34. Attorney General Robert Stephan and his deputy, Haney, testified that after receiving Wulf's letter they discussed it and determined not to pursue an investigation. Stephan testified that it was the policy of his office to make an initial inquiry regarding a matter of this nature and then refer it to the local district attorney's office for investigation. Haney testified that he made an inquiry only with respect to the

liquor and gambling violations alleged in the letter. Then Haney discussed the letter with Jim Puntch, of the Wichita District Attorney's Office. The discussion with Puntch led Haney to believe that the Wichita District Attorney's office had been contacted by Wulf and that it would be making inquiries into the allegations. Haney testified that pursuant to the policy to turn investigations over to local authorities, the matter of Wulf's letter was deferred to the Wichita District Attorney's office. Haney testified that he may have forwarded a copy of Wulf's letter to Puntch.

35. In early March of 1981, Wulf had showed the completed letter to Puntch. Wulf had requested that Puntch take no action regarding the letter since Wulf was sending the letter to the Attorney General. After Puntch met with Wulf to review the letter, Puntch informed District Attorney Clark Owens that there did not appear to be anything to investigate. Puntch and Owens did investigate the allegation involving the postage for the CPOA, but pursued no further investigations. Puntch testified that Haney called him, but stated that he was not asked by Haney to take over the investigation into the allegations of the letter. Puntch stated that he did not remember receiving a copy of Wulf's letter from Haney.

36. LaMunyon was angry about the letter. He testified at various times that he was upset about Wulf's writing the letter. LaMunyon stated that he was concerned that the letter would create problems in terms of morale, loyalty and disruption of the police department. The City presented no evidence that the letter actually hindered the operation, morale or efficiency of the Wichita Police Department.

37. During the early spring of 1981, LaMunyon discussed the letter with reporters Susan Edgerly, of the Wichita Eagle-Beacon, and Nelson Schock, of KFDI Radio. Schock, now deceased, stated in his deposition that LaMunyon had questioned him regarding whether Wulf had given any information to the media concerning Colonel Coffey. Schock stated that LaMunyon

further said that he was going to make sure nothing like that would happen again. LaMunyon testified that he asked Edgerly and Schock whether Wulf was the source of the information to the media about the Wichita Police Department. LaMunyon admitted that he told Schock, "If you get anything on Wulf, let me know."

38. Schock testified by deposition that he had a conversation with Wulf in which he told Wulf that Wulf was going to be fired and that he got this idea directly from LaMunyon. Wulf testified that he had been warned by Schock that he would be fired.

39. William Hirschman, a Wichita Eagle-Beacon reporter, testified that he contacted Wulf concerning the letter, but that Wulf would only discuss the letter in general terms. Hirschman contacted Wulf repeatedly over a period of several months, and Wulf remained unwilling to make comments for publication.

40. Hirschman and Edgerly went to the Wulfs' home on the evening of April 20, 1981. Mary and Sheldon Wulf both testified that Hirschman and Edgerly told them that Sheldon Wulf was going to be fired and sued over the letter to the Attorney General. Hirschman testified that to his best recollection he did not tell the Wulfs that Sheldon Wulf was going to be fired.

41. Dave Reavis testified that Wulf called him on the evening of April 20, 1981, and told him that LaMunyon knew of the letter and that Wulf was in trouble. Reavis' testimony is admissible to establish the time when Wulf acquired the knowledge that LaMunyon planned to fire him.

42. LaMunyon testified that after he read an article in the Wichita Eagle-Beacon on April 21, 1981, about Wulf's letter, he decided to conduct an investigation. He testified that he wanted to know the purpose of the letter, who helped Wulf collect the information contained in the letter, whether any City materials were used in the preparation of the letter, and whether Wulf or others violated any police department rules in preparing the letter. LaMunyon stated he had serious questions re-

garding Wulf's loyalty and trustworthiness. LaMunyon testified that he was not primarily concerned with the truthfulness of the allegations in the letter, although he would need to examine the specifics as a part of his investigation.

43. On April 21, 1981, between 6:00 and 6:30 a.m., LaMunyon called Wulf's Captain, Harold Koehler, and told him to have Wulf report to LaMunyon's office at the conclusion of his shift. At 7:10 a.m. LaMunyon began his Internal Affairs interview of Wulf. LaMunyon acknowledged that the Internal Affairs procedure outlined in the policy and procedure manual calls for an officer to have twelve hours to respond and write a report regarding any Internal Affairs investigation. LaMunyon admitted that Wulf was given no notice and no time to write a report before his interview. LaMunyon testified that the normal hours for Internal Affairs investigations are 8:00 a.m. to 5:00 p.m.

44. At the beginning of the interview, Wulf requested the opportunity to talk to an attorney before answering questions. Wulf testified that he wanted to talk to an attorney because he had been warned that he could be fired or sued. LaMunyon refused Wulf's request for an attorney and fired Wulf for insubordination in refusing to answer questions. LaMunyon testified at trial that if he knew all of the facts at the time of the interview that he knew at trial, he would have fired Wulf even if Wulf had answered his questions.

45. The penalties for a first offense of insubordination, specified in ¶ ¶ 2.100 and 3.400 of the rules and regulations of the Wichita Police Department, range from a reprimand to one to five days suspension.

46. Plaintiff's interrogatories, which cover the years 1978, 1979, 1980 and 1981, establish that no officer other than Wulf was fired by the Wichita Police Department for a first act of insubordination.

47. Lieutenant Ken Adamson testified that he was permitted to bring his attorney with him to an Internal Affairs interview, and that LaMunyon was willing to talk with Adamson's attorney and explain to the attorney the purpose and procedure of the Internal Affairs investigation.

48. Officer Pat Taylor testified that he had refused to answer questions during an Internal Affairs investigation in April of 1981, and that he was not disciplined for his refusal to answer questions.

49. Officer Don Goseland testified that he received three days off as discipline for shooting out the windows of a citizen's car, not in pursuit of any police duties.

50. Following Wulf's interview, LaMunyon conducted his Internal Affairs investigation, pursuant to the purposes set out in paragraph 42 herein. Several police officers were interviewed about the letter. After four days, LaMunyon discontinued the investigation, since it appeared that Wulf was the only author of the letter and because LaMunyon learned that his Internal Affairs investigation was causing a rift in the police department. LaMunyon testified that he never investigated the validity of Wulf's allegations and that he never authorized Internal Affairs investigators to ascertain the truthfulness of Wulf's allegations.

51. In the morning of April 21, 1981, after the interview with Wulf, LaMunyon called defendant Gene Denton, the Wichita City Manager, to report what had occurred. Denton told LaMunyon to check with the legal staff of the City and to check the personnel rules and department regulations. That afternoon, LaMunyon indicated to Denton that he had checked with the legal staff and confirmed Wulf's termination. LaMunyon testified that he had the final authority to terminate Wulf. Denton testified that he made the final decision to terminate Wulf. Both LaMunyon and Denton testified that Denton had a long-standing practice of delegating hiring and termination decisions to his department heads.

52. LaMunyon had notified Denton several times about the existence of Wulf's letter and had informed Denton when he had a copy of the letter. The only discussion of the allegations was that LaMunyon

told Denton he had been accused of union-busting. Denton testified that he directed LaMunyon to investigate the validity of the accusations. Denton stated that he received no written report but that LaMunyon reported to him orally that the charges were groundless and that other law enforcement agencies had come to the same conclusion. The District Attorney's office and the Attorney General's office did not arrive at the conclusion that the charges were groundless. Both simply determined not to take any action regarding the charges. *See supra* ¶¶ 34, 35.

53. After the interview, LaMunyon served Wulf with written notice of his termination in a letter dated April 21, 1981, which letter also informed Wulf of his right to grieve his termination. Wulf grieved the termination following the procedure set out in the Wichita personnel manual.

54. Sam Rothe, the City of Wichita's Employee Relations Officer, was the fact-finder in the grievance process. Rothe examined two documents: the letter of termination and a copy of the transcript of the termination interview. Rothe received all of his information from LaMunyon and a newspaper article. Rothe made no inquiries regarding the contents of the letter, nor did he talk to Wulf about the letter. Rothe did not look at the Wichita Police Department rules and regulations, had no access to Internal Affairs records, and made no comparisons of Wulf's termination with the discipline of other officers. Rothe's meeting with LaMunyon to ascertain the facts took no more than five minutes. Rothe conducted no independent fact-finding other than to interview Captain Koehler and Lieutenant Goward, and to examine Wulf's personnel file. Koehler and Goward were the officers who, with LaMunyon, had principally conducted the Internal Affairs interrogation of Wulf. On May 28, 1981, Rothe recommended affirmance of Wulf's termination.

55. After reviewing the recommendation of Sam Rothe and a transcript of the termination interview, Denton ratified Wulf's termination again. Denton conduct-ed no investigation. He did not look at Wulf's personnel file or ask anyone questions about Wulf's record of service. He did not review the penalties section of the Wichita Police Department rules and regulations.

56. Wulf appealed the decision of the City Manager to the Wichita Personnel Advisory Board. The Board was composed of four citizens and one city employee. The Board is advisory in nature and its decision is not binding on the City Manager. On June 30, 1981, the Personnel Advisory Board conducted a hearing on Wulf's grievance. Wulf had no discovery rights or subpoena power for the hearing. His requests for discovery were refused by the City's legal department. The only witnesses who testified at the hearing were LaMunyon and Wulf. Wulf and LaMunyon each testified about the termination interview. The Board did not consider the allegations in Wulf's letter. The Board found that Wulf refused to obey LaMunyon's order to answer questions and determined that Wulf's termination was proper. By letter of June 30, 1981, Denton advised Wulf that he had reviewed the findings of the Personnel Advisory Board and that he concurred in concluding that Wulf's termination was proper.

57. Sheldon Wulf was stigmatized in connection with the City's termination of his employment. After his termination, Wulf applied for employment as a police officer and for other law enforcement jobs. His efforts were unsuccessful. LaMunyon stated to the press that "none of [Wulf's] allegations were worth a damn." Further, LaMunyon talked to one of Wulf's potential employers and told him that Wulf did not "have his facts together when he went . . . to the Attorney General." Nelson Schock testified by deposition that he had talked to the same potential employer and that LaMunyon had told the prospective employer that he could not have a good working relationship with Wulf if Wulf were hired.

58. After his termination, Wulf applied for unemployment compensation. LaMu-

nyon contested his entitlement to unemployment compensation.

59. Wulf then began his own business as a private investigator. Wulf testified that the Wichita Police Department interfered with his investigation business by refusing him access to the Wichita Police Department's evidence locker.

60. As a result of his termination, Wulf suffered stress, depression, frustration, fear, distress and humiliation. As a result of the termination, Mary Wulf was forced to quit her employment and to begin free lance work as a court reporter. Mary Wulf withdrew all of her retirement money as a result of Sheldon Wulf's termination. The Wulfs were forced to borrow money. As a consequence of his termination, Wulf lost his salary and pension benefits, he could not afford to continue his life insurance and he had to pay for health insurance.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343.

2. Venue is proper in this district.

3. Section 1983 protects citizens against the deprivation of rights secured by the Constitution or laws of the United States by entities acting under the color of state law. *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). The First Amendment to the United States Constitution protects individuals against government actions which encroach upon or punish the exercise of free speech. *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The Fourteenth Amendment to the Constitution provides procedural and due process protections to all persons generally, and which apply in this case to government employees who are terminated from their jobs under conditions which deprive any person of life, liberty or property without due process of law," and the Fourteenth Amendment further entitles citizens to "equal protection of the laws." *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

*Property Interest Issue*

4. A public employee terminated from his employment is entitled to procedural due process only if he can show that he was deprived of an interest in property or liberty. *Perry v. Sinderman,* 408 U.S. 593, 599, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972).

5. A property interest in employment may be created by statute, ordinance, or express or implied contract; however, "the sufficiency of the claim of entitlement must be decided by reference to state law." *Bishop v. Wood,* 426 U.S. 341, 345, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976).

6. No state statutes create a property interest in Wulf's employment. Pursuant to K.S.A. § 75–4325, supervisory employees such as Wulf are not covered by the Kansas Public Employee Relations Act.

7. Section 2.08.090 of the Code of the City of Wichita provides that the city manager shall remove employees. No language in the ordinance establishes either a duration of employment for city employees or criteria for the removal of such employees. The provisions of the ordinance create no legitimate claim of entitlement to continued employment. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 48 L.Ed.2d 684 (1972).

8. To the extent that the ordinance creates an "entitlement" to have the city manager be the person who removes an employee from his job, the city manager's consistent delegation of that responsibility to his department heads does not offend traditional notions of procedural due process. Moreover, the city manager ratified Wulf's dismissal.

9. While the City's personnel policy manual provides the accepted reasons for dismissal of employees, it does not state any limits on the duration of employment. Furthermore, the manual does not give rise to any valid expectation of continued employment because it is the unilateral expression of the City's personnel policies.

The Kansas rule remains that an employment manual, that is only a unilateral expression of company policy and is not bargained for, cannot alone be the basis of an employment contract. *Accord Bahr v. Blue Cross of Kansas, Inc.,* 672 P.2d 1107 (Kan.Ct.App.1983); *Brown v. Wyandot Mental Health Center,* 688 P.2d 745 (Kan.Ct.App.1984).... *See, e.g., Owens v. City of Derby, Kan.,* 586 F.Supp. 37 (D.Kan.1984) (the employment manual was a unilateral statement of company policy and did not give rise to an express or implied contract); *Laughlin v. Bd. of Co. Comm'rs of Johnson Co., Kan.,* No. 83–2315 (D.Kan., August 27, 1984) (employment manual was a unilateral expression of county policy and did not constitute an express or implied contract); *Kasselman v. Hydrocarbon Transportation, Inc.,* No. 77–1353 (D.Kan., April 7, 1980) (employment manual was not bargained for, was unilateral, was merely gratuitous, and did not constitute a contract).

*Rouse v. Peoples Natural Gas Co.,* 605 F.Supp. 230, 232 (D.Kan.1985).

■ 10. Wulf contends that his case fits within the exception to the employment-at-will doctrine articulated by this Court in *Wynn v. Boeing Military Airplane Co.,* 595 F.Supp. 727 (D.Kan.1984). In *Wynn* the Court held that an employer may terminate an employee-at-will for any reason or for no reason, but not for a constitutionally impermissible reason. *Id.* at 728. Even if Wulf's case comes within the public policy exception to the employment-at-will doctrine, at best he has stated a cause of action for wrongful discharge. In his complaint, Wulf did not assert a pendent state claim for wrongful discharge. Because Wulf obtains complete relief on the remaining constitutional issues, the Court finds that it would be superfluous to permit Wulf to amend his complaint to conform to the evidence. Wulf argues that even absent amendment his wrongful discharge claim provides the basis for a property interest under the Fourteenth Amendment. According to Wulf's analysis, his property interest arose at the instant of his termination. This interpretation contravenes the fundamental notion of a property interest. *See Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. Furthermore, the Court disagrees with the proposition that whenever the tort of retaliatory discharge is established, the plaintiff has a property right sufficient to warrant Fourteenth Amendment protection. Not all state torts rise to the level of constitutional torts for purposes of section 1983. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

### Liberty Interest Issue

■ 11. To establish the deprivation of a liberty interest without due process, a plaintiff must show the infliction of a stigma to his reputation accompanied by a discharge from employment and the absence of a meaningful hearing to clear his name. *Asbill v. Housing Authority of Choctaw Nation,* 726 F.2d 1499, 1503 (10th Cir. 1984); *McGhee v. Draper,* 564 F.2d 902, 910 (10th Cir.1977).

■ 12. The stigma to reputation must foreclose the employee's "freedom to take advantage of other employment opportunities." *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707. A liberty interest may be impinged if an employer makes charges against an employee to potential clients or employers to prevent his reemployment. *Corbitt v. Anderson,* 778 F.2d 1471 (10th Cir.1985).

■ 13. Wulf's termination, coupled with LaMunyon's disparaging, false and stigmatizing statements to Wulf's prospective employers, which damaged Wulf's ability to obtain other employment, establishes a claim of liberty deprivation.

■ 14. If an employee's liberty interests are implicated, he is entitled to recover damages unless he is afforded an adequate hearing to clear his name. *Eames v. City of Logan, Utah,* 762 F.2d 83, 85 (10th Cir. 1985); *Hogue v. Clinton,* 605 F.Supp. 1288, 1297 (W.D.Ark.1985).

■ 15. A name-clearing hearing serves not to avert the unjustified denial of

a specific benefit but to allow the aggrieved party to cleanse his reputation. In determining the form of hearing required, courts must balance three factors: (1) the nature of the individual interest at stake; (2) the risk of erroneous deprivation and the probable value of additional procedural safeguards; and (3) the nature of the governmental interests involved. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). "While the features of such a hearing itself have been prescribed with substantial flexibility, courts have required that the claimant have notice of the charges which have been raised against him, and an opportunity to refute, by cross-examination or independent evidence, the allegations which gave rise to the reputational injury." *Campbell v. Pierce County*, 741 F.2d 1342, 1345 (11th Cir.1984).

16. Wulf was not afforded an adequate name-clearing hearing. The grievance officer, Sam Rothe, conducted no meaningful fact-finding. The City Manager ratified the termination decision three times, on the same days that the recommendations were made to him, without undertaking any independent investigation of the facts. At no time did the City of Wichita investigate the veracity of the contents of Wulf's letter to the Attorney General. Wulf's ability to marshal facts and evidence for the hearing was seriously hampered by the City's denial of his discovery requests. Although Wulf was permitted to have retained counsel at his grievance hearing, he was not permitted to subpoena witnesses. The grievance panel did not consider any issue other than Wulf's alleged insubordination. Since the grievance board did not evaluate the validity of Wulf's allegations or consider the circumstances surrounding his preparation of the letter, the board could not have adequately determined whether Wulf's termination was pretextual.

17. While due process does not require "adversarial, trial-like hearings for every discharged employee," *Rosewitz v. Latting*, 689 F.2d 175, 177 (10th Cir.1982), in this instance the plaintiff was not afforded an adequate opportunity to present his version of the case to the grievance board. In addition, Wulf presented credible evidence that additional procedural safeguards might have changed the result. The deck was stacked against Wulf by LaMunyon's termination and Denton's ratification, and the name-clearing hearing afforded Wulf did not sufficiently reshuffle the cards. The Court holds that the hearing given to Wulf did not comport with the requirements of due process. Therefore, Wulf was deprived of a liberty interest without due process of law.

*Equal Protection Issue*

18. To state a claim under the equal protection clause, a plaintiff must establish that an action of the government has treated similarly situated individuals differently. *United States v. Antelope*, 430 U.S. 641, 649–50, 97 S.Ct. 1395, 1400, 51 L.Ed.2d 701 (1977). The equal protection clause only guarantees like treatment to persons similarly situated. *Rostker v. Goldberg*, 453 U.S. 57, 79, 101 S.Ct. 2646, 2659, 69 L.Ed.2d 478 (1981).

19. While Wulf introduced some evidence that other officers were disciplined much more leniently than he and that other officers were treated differently during Internal Affairs investigations, the Court is unable to ascertain from the evidence that these other individuals were actually in circumstances substantially similar to Wulf. The evidence regarding Lieutenant Adamson bringing an attorney to an Internal Affairs investigation and the evidence regarding the discipline of Officers Goseland and Taylor is not sufficient to establish a denial of equal protection. However, this evidence lends support to Wulf's claim that his termination was pretextual.

*First Amendment Issue*

20. The First Amendment protects a government employee from discharge for speech on matters of public concern. *Connick v. Myers*, 461 U.S. 138,

103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The initial inquiry is whether the plaintiff's speech involved matters of legitimate public concern or, instead, involved matters of relevance solely to the plaintiff as an employee. *Conaway v. Smith,* No. 84–2434, at 8 (D.Kan., *unpublished,* December 3, 1985). To ascertain whether the speech rights involved matters of public concern, the Court must focus on the content, form and context of statements for which protection is sought. *Connick,* 103 S.Ct. at 1690; *Owens v. City of Derby,* 586 F.Supp. 37, 41 (D.Kan.1984).

21. Wulf claims he was fired because of the letter he wrote to the Attorney General. The allegations expressed in Wulf's letter ranged from interference with the constitutionally protected right of union membership to the improper use of public funds. Wulf's letter was far from an employee grievance regarding internal office policy. *See Conaway,* No. 84–2434, at 9. Furthermore, the letter, which was directed to the Attorney General of the State, requested an official investigation into the allegations of wrongdoing. The Court finds that Wulf's letter involved matters of public concern which he had the right to communicate to the chief law officer of the state.

22. Simply because an employer considers constitutionally protected conduct in deciding to discipline an employee does not render the employer's actions unconstitutional. *Mount Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). A court must balance an employee's First Amendment rights against the state employer's interest in the efficient operation of its public services. *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). In striking a balance between these interests, a court must consider "whether the speech impaired the employee's ability to perform his duties, disrupted working relationships requiring personal loyalty and confidence, or otherwise impeded the regular operation of the employing

agency." *Rookard v. Health and Hospitals Corp.,* 710 F.2d 41, 46 (2nd Cir.1983).

23. No evidence was introduced to show that Wulf's writing of the letter to the Attorney General in any way affected Wulf's ability to perform his duties. Further, the Court finds that Wulf was not engaged in the sort of working relationship with LaMunyon that required personal loyalty and confidence. Indeed, on at least one occasion, Wulf had been denied permission even to speak to LaMunyon. LaMunyon testified that the police department operated as a paramilitary organization. Thus, Wulf reported to his immediate superior and reported only indirectly to LaMunyon. *See Sprague v. Fitzpatrick,* 546 F.2d 560, 564 (3d Cir.1976), *cert. denied,* 431 U.S. 937, 97 S.Ct. 2649, 53 L.Ed.2d 255 (1977) ("[t]he crucial variant in [the *Pickering* balance] appears to have been the hierarchial proximity of the criticizing employee to the person or body criticized.") Wulf refused to discuss the letter with news reporters and submitted the letter only through the proper channels to the appropriate authorities. Finally, although LaMunyon testified that he was concerned that Wulf's letter would disrupt the police department, the defendants introduced no evidence that any disruption of police department activities or morale resulted from Wulf's letter. Even if LaMunyon had legitimate fears of disruption, the First Amendment balance can hardly be controlled by such a finding. "An employee who accurately exposes rampant corruption in her office no doubt may disrupt and demoralize much of the office. But it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office." *Porter v. Califano,* 592 F.2d 770, 773–74 (5th Cir.1979). If a public employee were to be deprived of the right to make critical statements about the manner in which governmental agencies are operated because of fear of provoking a dismissal, the public would be deprived of valuable information with which to evaluate the per-

formance of its officials, whether elected or appointed. Protecting the dissemination of such information is an essential function of the First Amendment. *Connick*, 103 S.Ct. at 1702 (Brennan, J., dissenting). Here, Wulf's speech involved matters of substantial interest to the public, while the defendants have made at best a weak showing of even potential disruption. Therefore, the Court concludes that Wulf's speech was protected under the First Amendment.

24. The employer's consideration of *Pickering*-protected speech does not *ipso facto* amount to a constitutional violation. Accordingly, the Supreme Court has formulated a test of causation to distinguish between results caused by a constitutional violation and those which would have occurred even absent the employee's protected conduct. *See* Milbrath, *The Free Speech Rights of Public Employees: Balancing the Home Field Advantage*, 20 Idaho L.Rev. 703, 711 (1984). A plaintiff must establish that his constitutionally protected speech was a "substantial" or "motivating" factor in the defendant's decision to terminate his employment. *Mount Healthy*, 429 U.S. at 287, 97 S.Ct. at 576. If the plaintiff discharges this burden, the burden of proof then shifts to the defendant to show by a preponderance of the evidence that it would have made the same decision "even in the absence of the protected conduct." *Id.*

25. The evidence is overwhelming that LaMunyon fired Wulf because Wulf wrote the letter to the Attorney General. LaMunyon had strained relations with the F.O.P. leadership. When informed that Wulf was writing a letter to the Attorney General, LaMunyon stated, "If that's the case, I'll have his ass." LaMunyon was extremely angry about the letter. LaMunyon asked Nelson Schock to let him know if Schock uncovered any information about Wulf. The only reason LaMunyon called Wulf in for an interview on April 21, 1981, was that Wulf had written the letter to the Attorney General. LaMunyon conducted the Internal Affairs interview outside of normal hours and immediately after reading about Wulf's letter in the newspaper. LaMunyon alleged that he fired Wulf for insubordination, the refusal to answer questions. A fair reading of the interview, however, indicates that Wulf remained willing to answer questions if he could have his attorney present. Thus, any "insubordination" by Wulf was not simply a whimsical disregard for authority. LaMunyon denied Wulf the right to have an attorney present, although he had permitted other officers to have attorneys present at Internal Affairs interviews. The testimony of several witnesses indicated that Wulf was going to be fired before he went into the interview. In the years 1978 through 1981 no other officer was fired for a first act of insubordination. Firing was not among the permissible penalties in the police department's regulations manual for a first act of insubordination. Because of the cumulative impact of all of these facts, the Court finds that Wulf's protected activity was the substantial or motivating factor in LaMunyon's decision to terminate Wulf's employment. Further, the Court finds that the defendants introduced no credible evidence that Wulf would have been terminated even if he had not written the letter. The defendants' claim that Wulf was fired for insubordination is pretextual. The case before the Court illustrates the typical plight of the whistle-blower who reports the misconduct, or what he believes to be the misconduct, of his superior. Sheldon Wulf was terminated from his employment precisely because he exercised protected First Amendment rights. It matters not whether the perceived misconduct is of great magnitude. However, in this case the misconduct involved both the fundamental rights of protected political association and freedom of speech as well as other infractions, some of which might be considered minor.

*Liability of the Defendants*

26. The plaintiff has established the personal liability of defendant Richard LaMunyon. LaMunyon was the policy maker for the Wichita Police Department. He testified that his decision to terminate

Wulf was controlling. His decision to terminate Wulf or to recommend Wulf's termination was based on impermissible concerns. LaMunyon arbitrarily and capriciously fired Wulf for Wulf's exercise of his First Amendment rights.

■ 27. Wulf has established the personal liability of defendant Gene Denton. Denton testified that in his position as City Manager he was the final adjudicator of Wulf's rights. Denton ratified LaMunyon's decision to fire Wulf three times. From his initial knowledge of Wulf's termination to his final ratification of that termination, Denton chose not to require meaningful fact-finding, even though he had been apprised of the allegations in Wulf's letter to the Attorney General. In *McClelland v. Facteau*, 610 F.2d 693, 697 (10th Cir.1979), the court held that "when the defendant was in a position of responsibility, knew or should have known of the misconduct, and yet failed to act to prevent future harm, liability accrues under section 1983." Denton not only acquiesced in, he directly ratified, LaMunyon's unconstitutional actions.

■ 28. Good faith immunity does not shield the individual defendants from liability. Qualified immunity is not available when the government officials' actions "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2783, 73 L.Ed.2d 396 (1982). The laws protecting the First Amendment rights of public employees have been clearly established for years. A reasonable government official would have known that to punish an employee under the circumstances in this lawsuit would violate the employee's First Amendment rights. The defendants are therefore liable in their individual capacities.

■ 29. The evidence supports a finding of liability on the part of the defendant City of Wichita under 42 U.S.C. § 1983. In *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611

(1978), the Supreme Court held that local government units could be made liable under section 1983 for actions taken pursuant to official policy or custom that caused a constitutional tort. The Court clarified this term that a single decision to take a particular action, if made by an appropriate policymaker, can establish the kind of "official policy" required by *Monell. Pembaur v. City of Cincinnati,* —— U.S. ——, 106 S.Ct. 1292, 1297, 89 L.Ed.2d 452 (1986). The decision-maker must possess "final authority to establish municipal policy with respect to the action ordered." *Id.,* 106 S.Ct. at 1299. In the instant case, both Denton and LaMunyon asserted that they were finally responsible for the decision to terminate Wulf. *See* K.S.A. 12–1014 (city manager is responsible for the affairs of the city). LaMunyon testified that he was the chief policymaker for the Wichita Police Department. Thus, the individual defendants are liable in their official capacities for damages flowing from Wulf's termination. Since Denton and LaMunyon, the City's official policymakers, made a deliberate choice to terminate Wulf—a decision which formed the basis of the constitutional tort—the City is liable under section 1983.

### Damages

■ 30. The purpose of a section 1983 damage award is to compensate the plaintiff for injuries caused by the deprivation of his constitutional rights. *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). The Court finds that Wulf is entitled to an award of front pay in lieu of reinstatement, and an award of back pay and lost benefits. The amounts of damages claimed by Wulf for lost pay and job benefits are agreed upon by the parties as factually accurate. The total amount awarded to Wulf for back pay, loss of use of income and taxes is $242,465.95. The defendants agreed with the plaintiff that reinstatement was not in the best interests of the parties. Therefore, the Court awards front pay to Wulf, calculated at the 1985 rate for a police lieutenant F step until retirement at 65 years of age, with an

additional factor for taxes, in the amount of $389,806.42. These future benefits must be discounted by their present value. *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983). It is not clear from the evidence adduced at trial whether the $389,806.42 figure has been discounted for present value. Therefore, the Court shall direct the parties to clarify the matter by way of stipulation. The Court further orders that if at the time of Wulf's death he is married to Mary Wulf, she shall be entitled to the widow's benefits provided to all officers with twenty years or more of service. In addition, the City is ordered to contribute its share of the plaintiff's pension through February 22, 1986, which will allow Wulf to receive the additional pension benefits for completing twenty years of service.

31. When a plaintiff has been deprived of substantive constitutional rights, damages may be awarded for nonpecuniary injury, such as psychological harm. *Foster v. MCI Telecommunications Corp.,* 773 F.2d 1116, 1120 (10th Cir.1985). Wulf suffered the loss of a liberty interest, which stigmatized him publicly. He was wrongfully discharged and, in effect, branded as a liar and a troublemaker. Wulf suffered the wrongful loss of his career. He has endured significant emotional pain and suffering. The Court finds that Wulf is entitled to $250,000.00 for mental anguish and emotional distress.

32. Punitive damages may be assessed in a section 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 57, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). The allowance of such damages involved an evaluation of the conduct in question, the wisdom of pecuniary punishment, and the advisability of a deterrent. *Miller v. City of Mission,* 705 F.2d 368, 377 (10th Cir.1983).

33. LaMunyon was extraordinarily angry that Wulf wrote the letter to the Attorney General. LaMunyon threatened to "have [Wulf's] ass." LaMunyon testified that he never investigated Wulf's allegations, although he reported to Denton that the charges were groundless. LaMunyon attempted, through surveillance and subterfuge, to find out "dirt" about Wulf and to obtain a copy of Wulf's letter. He summarily terminated Wulf, arguing pretextually that he was firing Wulf for insubordination. LaMunyon not only ruined Wulf's career, he also smeared Wulf's reputation by maligning Wulf to potential employers. After terminating Wulf, LaMunyon contested Wulf's entitlement to unemployment compensation. At worst, LaMunyon's conduct was malevolent, at best, it exhibited a callous disregard for Wulf's constitutional rights. An award of punitive damages is demanded by the nature of LaMunyon's conduct. Further, the award of punitive damages against LaMunyon will deter others in such positions of authority from future disregard of the constitutional rights of their employees. The Court finds that an award of $50,000.00 in punitive damages against defendant LaMunyon is appropriate.

34. The actions of defendant Denton, while exhibiting deliberate disregard for and indifference to Wulf's rights, do not possess that quality of callousness or malice which would make punitive damages appropriate. Therefore, the Court finds that punitive damages are not warranted against defendant Denton.

35. Municipalities, such as the City of Wichita, have no liability for punitive damages, on the theory that the taxpaying public should not bear the financial burden of punitive damages for the malicious acts of individuals. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 261, 101 S.Ct. 2748, 2756, 69 L.Ed.2d 616 (1981).

### Final Judgment

1. Judgment is hereby entered in favor of Sheldon Wulf against the individual defendants, Richard LaMunyon and Gene Denton, and the defendant City of Wichita,

for compensatory damages in the amount of $492,465.95. Judgment is further hereby entered for compensatory future damages in the amount of $389,806.42. The Court directs the parties to clarify by stipulation whether this figure represents the damage amount discounted by present value or whether another figure should be substituted as the present value.

2. Judgment is further hereby entered for the plaintiff against defendant Richard LaMunyon for punitive damages in the amount of $50,000.00.

3. Additionally, judgment is entered for the plaintiff against all the defendants for reasonable attorneys fees and expenses to be determined later by the Court pursuant to the guidelines established in *Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983).

4. Judgment is entered against all defendants for the costs of this action.