James A. BERRY, et al., Plaintiffs,

v.

GENERAL MOTORS CORPORATION,
Defendant.

No. 88–2570–JWL.

United States District Court,
D. Kansas.

Nov. 30, 1993.

Dennis E. Egan, The Popham Law Firm, Kansas City, MO, Christopher Iliff, Stillwell, KS, Michael K. Whitehead, Kansas City, MO, for plaintiffs.

Michael J. Grady, Paul Scott Kelly, Jr., Gage & Tucker, Overland Park, KS, John J. Yates, Paul Scott Kelly, Jr., Marietta Parker, Rosalee M. McNamara, Jean Paul Bradshaw, II, Gage & Tucker, Kansas City, MO, Stephen A. Murphy, Westwood, KS, for defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

This action arises out of a restructuring and shifting of personnel associated with the closing of one General Motors Corporation plant in Kansas City, Kansas, and the opening of another in 1987. Fifteen plaintiffs brought suit against General Motors Corporation ("GM"), alleging various theories of recovery, including race discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 *et seq.*; sex discrimination under Title VII; age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 623 and 626(c); and breach of an implied contract of employment.

The procedural history of this case is long and complicated, as the original complaint was filed over four years ago. The case was originally tried to a jury beginning August 11, 1992, but the court declared a mistrial on September 9, 1992, because the jury was unable to reach a unanimous verdict.[1] The case was rescheduled for jury trial in July of 1993. However, the plaintiffs and the defendant, in an effort to limit expense and avoid the then looming possibility that funds to compensate civil jurors might be unavailable, agreed to waive the right to a jury and submit the case to the court. The parties stipulated that the court would decide the case based on the evidence admitted in the August, 1992 trial, along with certain supplemental damage evidence put on at a hearing July 27, 1993. Following post-trial briefing, on September 27, 1993, oral arguments were heard from all parties. This case is now ripe for decision.

After careful consideration of all the evidence, the court finds, by a preponderance of the evidence, that no implied contract existed to create a legal right in favor of any of the plaintiffs to be accorded treatment as set out in "Working with General Motors," the corporation's employee policy manual. After considering the conduct of the parties, the usages of the business, the situation and objectives of the parties giving rise to the employment relationship, the nature of the employment, negotiations between the parties, and other circumstances surrounding the employment relationship, the court finds that the parties did not mutually intend a contract based on the terms of "Working With General Motors" ("employment manual"). As a result, the court concludes that GM had the right to treat plaintiffs as month-to-month employees, and grants judgment in favor of the defendant General Motors Corporation as to all implied contract claims.[2]

---

1. As set out in full on the trial record, after all the evidence was heard, the court granted defendant's motion for judgment as a matter of law under F.R.C.P. 50 regarding plaintiff DiDonna's claim for breach of an implied contract and her national origin/race discrimination claims; Howell's sex discrimination claim; Gold and Scott's race discrimination claims; and Worthley's breach of contract claim. Other claims had been disposed of on a motion for summary judgment the previous year. *See* Court's Memorandum and Order dated June 17, 1992, 796 F.Supp. 1409.

2. The court did not consider any arguments raised in the final briefs submitted by the parties that were not preserved in the pretrial order. *See Perry v. Winspur*, 782 F.2d 893, 894 (10th Cir.1986) ("It is well established that unless the court modified its pretrial order, the parties are bound to its contents and may not contradict its terms."); *Hullman v. Board of Trustees of Pratt Community College*, 732 F.Supp. 91, 92 (D.Kan. 1990), *aff'd*, 950 F.2d 665 (10th Cir.1991); Fed. R.Civ.P. 16. Thus, any reference by GM to the alleged existence of some written contract between it and some or all of the plaintiffs was not

The court also finds that none of the plaintiffs has met their burden of persuasion regarding discrimination claims against GM. The court grants judgment in favor of GM on all discrimination claims as well.

Pursuant to F.R.C.P. 52(a), the court makes the following findings of fact and conclusions of law.

## I. Findings of Fact

### A. Findings Applicable to All Plaintiffs

1. In February and March of 1985, GM announced the opening of a new plant ("Fairfax II") to be built in Kansas City, Kansas next to its existing Fairfax Plant ("Fairfax I"), to facilitate the development of a new type of mid-sized car targeted to compete with its foreign competitors. Auto assembly at Fairfax II would be technologically advanced and would require several hundred fewer employees for its operation. A "downsizing"[3] of personnel was required. At the outset of the downsizing, employees at the Fairfax I Plant were told by GM management it was intended that no salaried employee be laid off or terminated as a result of the move to Fairfax II.

2. In 1986, GM announced it intended to conduct a reduction-in-force to reduce the corporation's entire salaried work force by twenty-five percent. The purpose of the reduction was to make GM operations more efficient and profitable in an increasingly competitive marketplace. The change in operations was a response, in part, to the decline in profits and in market share of domestic automobile sales that GM was facing in the late 1970's and 1980's.

3. Gus Beirne was appointed plant manager of Fairfax I in April of 1985, and was in charge of the construction of Fairfax II until the plant was scheduled to be completed in May of 1987.

4. After the announcement of the move to Fairfax II, GM held two meetings at Kemper Arena for both salaried and hourly Fairfax employees to provide information about the future changes in plant operations and personnel. GM did not represent to salaried employees at either of these meetings that "Working With GM" would apply to the downsizing. Employees were told, however, that no layoffs would occur as a result of the downsizing and that any reductions would be handled by natural attrition.

5. In order to reduce the work force in Fairfax II, GM offered incentives to employees to leave the corporation voluntarily. Two programs were put into place: (1) an early retirement program; and (2) a "buyout" program, through which employees could receive cash payments based on years of service if they elected to separate from GM. Plaintiffs in this case were offered these two options (retirement only if qualified) and at least one other: return to the hourly roles if they were eligible. It is unclear whether a fourth option, to remain salaried, was offered to plaintiffs.[4]

6. The skills required to be a supervisor in the new Fairfax II plant were to be different from those required in Fairfax I. A new

considered except for limited purposes as specifically noted with regard to those plaintiffs who acknowledged having signed a written agreement. Similarly, plaintiffs' argument, raised for the first time in its post-trial briefs and at oral arguments in September of 1993, that express unilateral contracts were formed, was not considered or examined when deciding this case. The court decided the case in precisely the posture in which it had been submitted to the jury in 1992.

3. The parties have quarrelled throughout about the use of this term to describe the events which gave rise to this suit. The term "downsizing" is used in this order to reflect the changes in the work force that were taking place during the move from Fairfax I to Fairfax II because that is the term used by GM itself. The downsizing of the work force in this case required reductions in the number of personnel. Whether the difference between GM's preferred term, "downsizing," and the plaintiff's preferred term, "reduction-in-force," (evoking the language of the employment manual) bears any legal significance is not addressed here because the court finds that GM was not legally bound by the terms of the employment manual in any event.

4. Plaintiffs contend the employment manual required that GM offer some of the plaintiffs the option to remain salaried. The court does not reach this issue, however, because it finds that there was no implied contract based on the terms of the employment manual, "Working With GM," and GM was not legally bound to follow the manual in the downsizing.

management style would be in place, a "cultural change," that would change the supervisor position to a type of "team leader" who had strong skills in dealing with people and could act more as a coach than as a boss.

7. Over the years, GM had published and distributed a personnel policy manual entitled "Working With General Motors," establishing procedures that GM pledged to follow when making employment decisions relating to qualified employees. The manual, however, specifically included a disclaimer stating that it was not intended to create a contract and stated specifically that all salaried employees worked on a month-to-month basis. Relevant portions of the manual are as follows:

*Introduction*

"Working With GM" describes personnel policies and procedures that guide relationships as we work together in General Motors.

In moving forward it is important for you to know the personnel policies and procedures that apply to you. "Working With GM," we think, provides a clear summary of the most significant of these policies and procedures and we are pleased to make it available to you.

*Page 4.*

Regular Employe[5]

As a regular employe, your employment is on a calendar month-to-month basis.

Regular employe status enables you to share in the privileges associated with salaried employment, as described throughout this handbook.

*Page 25.*

General Motors formal policy with respect to employment security for classified salaried employes is contained in the following policy statement:

"Salaried employes with one year of service whose performance is consistent with GM's standards will not be laid off due to outsourcing, productivity improvements and new technology. Layoffs may occur as a result of declines in volume of business, shifts in market preferences or reorganizations...."

*Page 27.*

In the event that outsourcing, productivity improvements or introduction of new technology result in the need for fewer salaried employes, units will first attempt to achieve the necessary reductions through the separation of non-regular employes. If salaried manpower is still in excess of unit needs, redundant regular salaried employes will be identified through the existing reduction-in-force policy. However, those employes will not be laid off but will be placed in transitional status.

If layoffs become unavoidable, reductions in the work force are made separately by each department and job classification....

Reductions will be made generally in the order of least total Corporate length of service for employes with five or more years of length of service and with a performance rating of Good Competent or higher.

*Page 32.*

This booklet has been written in a general way, to cover what are considered to be the most important highlights of GM's salaried personnel policies.

To better meet the needs of GM people and GM, policies have been modified from time to time. GM believes this should occur only when absolutely necessary, and that when it does occur, you should receive a prompt and full explanation of the changes and the reasons behind them.

**While the policies and procedures in the booklet do not constitute a legal contract, and do not modify the month-to-month employment relationship (which in fact may not be altered, amended or extended by any employe, representative or agent of GM) described on page 4, GM does believe they represent a good basis for a productive relationship between you and GM.** For this reason, we are committed to their full implementation in every GM unit and to their sound administration. (emphasis added).

8. The court finds that the words used in the employment manual excerpts set forth

5. GM uses this spelling of the word "employee" throughout the manual.

above do not indicate an intent to be contractually bound. Phrases like "guide relationships," "clear summary of the most significant of these policies and procedures," and "[r]eductions will be made generally" in a particular way do indicate an intent to try to establish some order and regularity in the workplace without relinquishing ultimate control. So, too, do the specific references to a month-to-month employment relationship not subject to alteration and the express statement that "the policies and procedures in the booklet do not constitute a legal contract" provide compelling evidence that the defendant never manifested any assent to be bound.

9. Beirne, the plant manager of Fairfax I, stated that he believed he was obliged to use the procedures covered in the employment manual when making reductions and that such policies would apply to a downsizing. It was his understanding that "Working with GM" applied to how he dealt with all salaried employees. However, Beirne stated that the downsizing to Fairfax II was unique in GM's experience and it was not fully covered by the manual.

10. The plaintiffs, as salaried employees at GM, did not belong to a union and the policy manual was not subject to a negotiation or ratification process the way a union contract might be. The court finds that none of the plaintiffs ever negotiated for any terms of the employment manual.

11. GM official policy, as represented in the manual, was not controlled by any individual plant manager or Gus Beirne the manager of Fairfax I and II, but rather was the product of GM central staff in Detroit, Michigan. From time to time, policy changes were made, unilaterally by GM, and no plaintiff had input in the policies represented by the employment manual.

12. The selection of salaried employees who would be denied the same position or salaried status at Fairfax II was made according to a new set of criteria and not according to corporate length of service, or seniority. The manual designated corporate length of service and performance ratings as the criteria to determine which employees had priority when reductions in personnel were required.

The performance ratings were a part of an established appraisal system whereby a salaried employee was graded or ranked on a periodic basis according to his or her level and quality of performance in keeping with the hierarchical management style historically used by GM. GM discarded these criteria, in favor of a new set of criteria, in attempts to keep those salaried employees who could work most successfully in the team-like operation intended for Fairfax II.

### B. Findings of Fact Applicable to Specific Employees

#### 1. James A. Berry

13. James Berry, an African–American, was a salaried supervisor at GM, who had worked for the corporation in various capacities for almost twenty years before his position was terminated in 1987. He was forty-one years old at the time he was considered for a position at Fairfax II.

14. In 1973, Berry acknowledged he signed an employment agreement with GM which stated that his employment was on a month-to-month basis. At various times subsequent, Berry signed compensation statements that stated that there were no agreements, verbal or written, that could affect the terms of employment established between he and GM other than the initial contract and the compensation statements.

15. Berry read "Working With General Motors" and also read and was aware of the disclaimer on the last page. Berry, however, believed the month-to-month language referred to how and when GM could alter an employee's pay.

16. Berry was aware of the fact that several GM programs had changed significantly during his employment without his negotiation or consent. During the period of time in which Berry worked for GM, GM unilaterally modified its procedure for calculating length of service for layoff and reduction-in-force purposes on three different occasions. Similarly, the benefits Berry was entitled to as a salaried employee were modified unilaterally by GM during his years of service.

17. Berry received conflicting statements from his superiors as to whether he would be included in the move to Fairfax II. At times he was told he would move to the new plant, at other times he was told there was no position for him.

18. George Neece was the Superintendent of the body shop and was responsible for the staffing of the body shop at Fairfax II. Neece understood from Beirne that he was to staff his organization with the best people to handle the new technology and the new team concept at Fairfax II. Although Neece had been assigned to the body shop roughly eight months before the changes were made, he had sufficient knowledge of his organization and the people within it to make staffing decisions. The body shop salaried staff was required to be reduced from thirty-two to nineteen employees.

19. Neece, the Superintendent of the body shop, used the following criteria to determine which employees would be selected to staff his department at the new plant: (1) experience as a car builder; (2) self-starter capabilities; (3) ability to work well with people and the union; (4) trustworthiness within the organization; (5) compatibility with the team concept; and (6) demonstrated performance.

20. Neece did not select Berry for the move to Fairfax II because he believed Berry was not highly motivated, nor a "self-starter," and because he was concerned that Berry lacked the skills necessary to relate well with his peers and other employees, and to work within the team concept that GM intended to implement with the new employment structure of Fairfax II.

21. Berry had a good working relationship with Neece and stated that he had no reason to believe that Neece had any ill will toward him either because of his race or his age. He also had a good working relation with Jim Schmer.

22. Throughout Berry's employment, various GM supervisors made improper, and at times insulting, remarks to him. In 1972, Ray Craft, a white male, told Berry on more than one occasion that he was "a good boy." Bill Holek, a supervisor with some input in the Fairfax II selection process, told Berry that if there was ever a reduction-in-force, he was gone, and at one time mouthed the words "I hate you." On occasion, Tom York, another supervisor, used the word "Buck" in a joking manner in Berry's presence. Berry testified that he did not believe the remarks were directed specifically at him, and that once he complained to GM management, York's use of the word stopped. Ernie Carpenter, who also participated in the decision not to select Berry, on occasion told him to do menial jobs including sweeping floors and picking up cups. It is unclear, however, whether Carpenter treated other supervisors in a similar manner. Berry testified that he believed Carpenter was uneasy working with black men and was particularly uncomfortable around educated black men.

23. The court finds that there was no implied contract between Berry and GM.

24. The court finds that age was not a determinative factor in the decision not to select Berry as a supervisor at Fairfax II.

25. The court finds that race was not a determinative factor in the decision not to select Berry as a supervisor at Fairfax II.

### 2. Michael Carter

26. Michael Carter was an employee with GM for over ten years when the changes related to Fairfax II took place. He was initially hired as an hourly employee, but became a supervisor in 1982.

27. Carter read "Working With GM" in its entirety, but admitted he had never had any negotiations with GM regarding its terms or conditions. In the course of his employment, Carter signed several compensation agreements which describe his employment as month to month.

28. Carter understood that GM had the right to make job assignments of its salaried personnel without any regard to length of service, and also believed that he could unilaterally terminate his employment with GM at any time, with little or no notice.

29. Carter is presently assigned in a supervisory position at the Fairfax II plant.

30. The court finds that there was no implied contract based on the terms of "Work-

ing With GM" between Carter and General Motors.

### 3. Richard L. Dold

31. Richard Dold was an employee for GM for over twenty years before the transition from Fairfax I to Fairfax II.

32. Dold read "Working With GM," and admitted he had signed an employment agreement that stated the term of his employment was month to month. He signed compensation statements and an employment agreement that stated GM's intent to create a month-to-month employment relationship.

33. Dold expected a reduction-in-force by seniority and competent performance as set out in the employment manual, and was told by GM management that no layoffs were necessary because the reduction would be accomplished by retirement and attrition.

34. Todd Berkley was the Superintendent of the hard trim department and made the decision to deny Dold the same position at Fairfax II. Berkley used the following criteria to choose among employees: (1) problem solving ability; (2) ownership of problems; (3) being a self-starter; (4) people skills, e.g. getting along with people, team problem solving, fairness, honesty. Berkley did not select Dold because he did not believe Dold was a top performer.

35. The court finds that there was no implied contract based on the terms of "Working With GM" between Dold and General Motors.

### 4. Eugene Gold

36. Eugene Gold was an employee with GM for twenty-four years before the events of 1987. He was forty-four at the time.

37. Gold received and signed compensation agreements that evidence GM's intent to create a month-to-month employment relationship. He was also aware of the language in "Working With General Motors" which stated that "policies and procedures [set out in the manual] do not constitute a legal contract," and of the provision that stated "As a regular employe, your employment is on a calendar month-to-month basis."

38. Berkley made the decision not to offer Gold a supervisory position at the new plant because he was not as good as his peers, he did not do a good job of coordinating among shifts and he was not a self starter. The criteria used was as follows: (1) problem-solving ability; (2) ownership of problems; (3) being a self-starter; (4) people skills, e.g. getting along with people, team problem solving, fairness, honesty.

39. Gold returned to the hourly roles, but noted he did so under protest, and was subsequently laid off for a period of time.

40. Thirteen employees over forty and nine employees under forty worked at Fairfax I in the hard trim department. After the transfer, eight employees over forty and four employees under forty remained. Five hard trim supervisors who were younger than Gold were taken to Fairfax II.

41. The court finds that there was no implied contract between Gold and General Motors.

42. The court finds that age was not a determinative factor in the decision to deny Gold a position as a supervisor in Fairfax II.

### 5. Lloyd Hendrix

43. Lloyd Hendrix was an employee with GM for over twenty-five years before the 1987 changes.

44. Hendrix signed an employment agreement and a compensation statement both of which describe his employment as month to month.

45. Hendrix was not involved in negotiating changes in "Working With GM" or with cost of living adjustments in his salary.

46. Hendrix was given what he considered a less desirable position at Fairfax II, but was laid off within a short period of time.

47. Hendrix was not chosen as a supervisor in the new plant because his superiors determined that he required too much supervision.

48. The court finds there was no implied contract between Hendrix and General Motors.

### 6. Ronald W. Walsh

49. Ronald Walsh was an employee for GM for almost twenty years when Fairfax II was put in place.

50. Walsh signed an employment agreement with GM and periodically signed compensation statements that referred to his status as a month-to-month employee.

51. Before the transfer to Fairfax II Walsh had never read "Working With GM." However he believed the past practice of GM was to follow the provisions of the employment manual and base reductions-in-force on corporate length of service and performance ratings.

52. Walsh returned to the hourly roles after the downsizing.

53. The court finds that there was no implied contract based on the terms of "Working With GM" between Walsh and General Motors.

### 7. Robert King

54. Robert King was an employee with GM for almost twenty years before the transfer to the Fairfax II plant.

55. King signed an employment agreement and various compensation statements that referred to his employment status as month-to-month. King had also read "Working With GM," and was aware of language stating that it was not a legal contract.

56. King admitted he never negotiated for the terms of the employment manual and that he knew policy decisions were made in Detroit. He was also aware that throughout his employment GM had unilaterally changed some benefits promised in the manual.

57. King's superiors told him early on that no one would be forced out of a job at Fairfax II and that reductions would be made by normal attrition and retirement.

58. King worked as a sixth level supervisor until he was laid off in 1992.

59. The court finds that there was no implied contract between King and General Motors.

### 8. George Simpson

60. George Simpson worked for GM for over fifteen years before the downsizing. He was a sixth-level supervisor in the hard trim department in May of 1987.

61. Simpson signed an employment agreement which stated that his employment was from month to month and that he agreed to devote his time and service in the employ of GM in such capacity as GM might direct. Simpson also read "Working With GM" and the language that stated it was not a legal contract and that his employment was on a month-to-month basis.

62. Berkley did not select Simpson because of his belief that Simpson did not take ownership of problems and showed a lack of knowledge as to repair problems.

63. The court finds that there was no implied contract between Berkley and General Motors.

### 9. Linda Howell

64. Linda Howell was forty-one years old and worked in the benefits section of the personnel department as a fifth-level specialized clerk at the time of the move to Fairfax II.

65. Howell read "Working With GM," including the section that indicates the booklet is not a legal contract. She expected that reductions would be made according to seniority based on the procedure set out in the employment manual because of the language of the manual and GM's past practices.

66. Timothy Danahy was the Personnel Director at Fairfax I in May of 1987, had held the position since 1980, and was required to examine the entire personnel operation to determine where cuts could be made to increase efficiency of the plant. Danahy, James Schmer, the Administrator of salaried personnel, and Cinda Clark, the Supervisor of Employment, were involved in the decisions made regarding staffing the personnel department at Fairfax II.

67. Howell was not permitted to retain her position in Fairfax II. Clark, Schmer and Danahy ranked Howell fifth out of six specialized clerks. The benefits clerk position

was eliminated in the course of the downsizing and the function taken over by management in Detroit.

68. In April of 1986, Howell was invited to lunch by Cecil Oldham, her supervisor, for secretary's day, but Howell refused. Prior to her refusal she was treated favorably by Oldham, but afterwards she saw significant changes in his treatment of her.

69. Howell testified that she did not believe that Cinda Clark, her direct supervisor at the time of the selection of personnel for Fairfax II, would discriminate against her based on age or sex.

70. Cinda Clark was not aware of Howell's complaint against Oldham when the decision not to select Howell was made. She was aware, however, that Howell had complained about offensive language used in her presence.

71. Clark testified that neither sex nor age was a consideration in the decision not to select Howell. She also testified that out of the five female and one male specialized clerks in personnel, four female and one male were taken to Fairfax II, and that of the two clerks over forty, one was selected and one was not.

72. Three males in Howell's classification with less corporate length of service were transferred to Fairfax II. The only reason Howell believed sex played a role in her nonselection was because these men retained their positions, but she did not.

73. The only reason Howell believed her age was a factor in the decision to deny her a position in the personnel department at Fairfax II was that there were younger employees selected and she was not selected.

74. Howell filed sex discrimination complaints on June 29 and October 2, 1987. Subsequently she was reassigned to security, her hours were changed, she was denied vacation pay, and she never received a lump sum bonus.

75. Danahy testified that several people were assigned to security who did not make discrimination complaints and that he never told anyone in security where Howell should be placed.

76. Howell acknowledged that other employees, who had not filed charges of discrimination with the EEOC, also did not receive recognition awards or bonuses. Howell had never received such an award at any time before she filed her claims. Recognition awards were awarded at the discretion of a GM department head to employees whose contribution to the corporation was considered to be deserving of special recognition.

77. Howell has never been fired from GM, but has been laid off for over five years.

78. The court finds that there was no implied contract between Howell and General Motors.

79. The court finds that GM did not take action against Howell in retaliation of her filing a discrimination claim against the corporation.

80. The court finds that GM did not discriminate against Howell on the basis of age.

### 10. Richard L. McCauley

81. Richard McCauley was forty years old at the time the staffing decisions for the new plant were made, and had worked for GM for over fifteen years. He was a fifth-level material scheduler assigned to the material department at the time of the downsizing.

82. McCauley believed that layoffs or reductions in the work force would be determined by length of service by department classification according to the employment manual. McCauley received a manual and believed it contained the terms of his employment.

83. James W. Holsapple was McCauley's supervisor, the Material Director at Fairfax I, and had held the position for over ten years. He believed he was required to select employees based on their ability to thrive in the team atmosphere that was intended for the new plant.

84. Holsapple chose not to select McCauley for Fairfax II based on the following criteria: (1) ability to handle a multiplicity of tasks and flexibility; (2) education level; (3) different job experiences with GM; (4) ability to work with computer systems; (5) teamwork capabilities; (6) and ability to work with sup-

pliers. Holsapple's selections were reviewed by Beirne, the plant manager.

85. Holsapple testified that age was not a consideration. Only two of five materials schedulers were taken to Fairfax II and both were older than McCauley. McCauley was the youngest level five materials scheduler.

86. The court finds that there was no implied contract between McCauley and General Motors.

87. The court finds that age was not a determinative factor in GM's decision not to assign McCauley a position as a material scheduler in Fairfax II.

### 11. Harold Scott

88. Harold Scott was employed in the scheduling department of GM as a fifth-level material control scheduler in May of 1987.

89. Scott testified he relied on "Working With GM," although he never read the manual. He stated he knew it was the past practice of GM to conduct a layoff by reducing personnel in reverse order of seniority. Scott knew of layoffs among salaried ranks that did not follow seniority depending on the circumstances at the time.

90. The court finds that there was no implied contract between Scott and GM.

### 12. Bernard Hurt

91. Bernard Hurt was forty-two years old in May of 1987 and worked for GM for almost fifteen years before the move to Fairfax II. At the time of the downsizing, Hurt was a fifth-level Associate Reliability Engineer in the quality/reliability department.

92. Hurt read "Working With GM," including the language that states it does not create a contract and does not modify the month-to-month employment relationship. He also believed he could leave GM at any time and that GM could terminate his employment at any time.

93. Approximately a year before the move to Fairfax II, Hurt was trained for a foreman position but did not receive it. He was one of three people out of a group of 200 who scored a seven out of ten on the foreman test. He was not sponsored as a foreman, although another employee with a score of five was sponsored.

94. One of Hurt's superintendents stated, in Hurt's presence, that GM needed younger employees at the new plant.

95. A number of fifth-level reliability engineers did not get selected for Fairfax II, and there were also employees over age forty who were selected.

96. Andrew Dooley was the Director of Quality/Reliability in May of 1987 and was required to staff the quality/reliability organization at the new plant.

97. Dooley made the selections for Fairfax II based on the following criteria: (1) how well the employee related to people; (2) performance; and (3) whether they worked well in a cooperative environment. Dooley stated that age was not considered and that he was never directed to select a younger staff.

98. On April 9, 1987, Hurt filed a claim for age discrimination. On April 24, 1987 he received a performance evaluation which rated him as highly effective. On April 29, 1987, he was told by his general supervisor that he would have to go back to hourly.

99. Hurt testified that Dooley stated that he should take the buyout because he did not have a job and could not become salaried again. Hurt believes Dooley was aware of the discrimination suit when he made these statements. Dooley, however, testified that he was unaware of the claim when he selected personnel for the new plant.

100. The court finds that there was no implied contract between Hurt and GM.

101. The court finds that age was not a determinative factor in GM's decision to deny Hurt a position as a fifth-level Reliability Engineer in the quality/reliability department at Fairfax II.

102. The court finds that GM's decision to deny Hurt a fifth-level Reliability Engineer position at Fairfax II was not in retaliation for his having filed a charge of age discrimination against the corporation.

## II. Conclusions of Law

### A. Implied Contract Claims

At the outset, before making specific conclusions as to the claims of each plaintiff, the court believes that preliminary observations are in order. The plaintiffs' claims can thus be placed in context within this still evolving area of law.

■ Kansas has been, and remains today, an "employment-at-will" state. *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 551 P.2d 779 (1976). Under the employment-at-will doctrine, employment is terminable at the will of either the employer or the employee for good cause or no cause at all. The force of the doctrine in Kansas, however, has been tempered by recent decisions. *See Morriss v. Coleman Co.*, 241 Kan. 501, 738 P.2d 841, 845–47 (1987).

■ Kansas courts have developed two exceptions to the employment-at-will doctrine. *See Brown v. United Methodist Homes For Aged*, 249 Kan. 124, 815 P.2d 72, 79 (1991). For one, an employer may not invoke the doctrine when the employer's conduct undermines an important public policy. *See Cain v. Kansas Corp. Comm'n*, 9 Kan.App.2d 100, 673 P.2d 451 (1983); *Murphy v. City of Topeka*, 6 Kan.App.2d 488, 630 P.2d 186 (1981) (recognizing claim for discharge in retaliation for filing a workers' compensation claim). This exception is narrow, as the traditional employment-at-will analysis applies unless "discharge seriously contravenes a very clear public policy." *Morriss*, 738 P.2d at 847–48 (citing *Cain v. Kansas Corp. Comm'n*, 9 Kan.App.2d 100, 673 P.2d 451 (1983)). Second, an employer may not treat an employee as one at-will when there has been an implied agreement to the contrary. An implied obligation exists "on the part of the employer not to terminate an employee arbitrarily where a policy or program of the employer, either express or implied, restricts the employer's right of termination at will." *Morriss*, 241 Kan. at 509, 738 P.2d 841.

The claims in this case do not invoke the public policy exception as announced in *Cain* and *Murphy*. *See also Larson v. Ruskowitz*, 252 Kan. 963, 850 P.2d 253, 257 (1993); *Pilcher v. Board of County Comm'rs of Wyandotte County*, 14 Kan.App.2d 206, 787 P.2d 1204, 1207 (1990). Thus, for plaintiffs to prevail, the court first must be persuaded that an implied contract existed between the plaintiffs and General Motors.

In *Allegri v. Providence St. Margaret Health Center*, 9 Kan.App.2d 659, 684 P.2d 1031 (1984), the Kansas Court of Appeals examined the implied contract exception in the context of an action for wrongful discharge. The plaintiff alleged that the defendant breached an implied contract that he remain employed so long as he performed adequately. The court held that whether an implied-in-fact contract exists is a question of fact, and that a material issue of fact as to whether there was an implied contract precluded summary judgment against the plaintiff. *Id.* 684 P.2d at 1036; *see also Butler v. Westgate State Bank*, 3 Kan.App.2d 403, 596 P.2d 156 (1979) (existence of an implied-in-fact contract is a question of fact). The *Allegri* court set forth the following as the relevant inquiry for the trier of fact:

> Where it is alleged that an employment contract is one to be based upon the theory of "implied in fact," the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced.

*Allegri*, 9 Kan.App.2d 659, 684 P.2d 1031, 1035. In *Morriss v. Coleman Co.*, the Kansas Supreme Court approved the test set forth in *Allegri* and further solidified the application of implied contract principles to alter the status of an at-will employee. 241 Kan. at 510, 738 P.2d at 847.

■ The controlling question as to whether a binding contract has been entered into depends on the intention of the parties. *Sidwell Oil & Gas Co., Inc. v. Loyd*, 230 Kan. 77, 630 P.2d 1107 (1981). In order for par-

ties to form a binding contract, there must be what Kansas courts still sometimes refer to as a "meeting of the minds." *Id.; Care Display, Inc. v. Didde–Glaser, Inc.*, 225 Kan. 232, 589 P.2d 599 (1979). Although a contract implied in fact does not involve the traditional notions of offer and acceptance, it still must represent the manifestation of mutual assent to be bound. A unilateral expectation on the part of the employee for continued employment is not sufficient. *See Conyers v. Safelite Glass Corp.*, 825 F.Supp. 974, 977 (D.Kan.1993) (citing *Copple v. City of Concordia*, 814 F.Supp. 1529, 1536–37 (D.Kan.1993). A reasonable person must be able to find from all relevant circumstances of the plaintiff's employment that there was an intent on behalf of both sides to be bound. *See Atchison County Farmers Union Co-op Ass'n v. Turnbull*, 241 Kan. 357, 363, 736 P.2d 917 (1987) (a mutual intent to contract must be shown for an implied contract in to exist).

In this case, plaintiffs allege that there was an implied contract based on the terms set out in GM's employment manual, "Working with General Motors." The plaintiffs argue that because GM generally followed this manual and because employees generally relied on its terms, an implied contract was created. The existence of this written policy manual is probative of the issue of whether an implied contract was created, but it is not determinative. *See Brown v. United Methodist Homes For Aged*, 249 Kan. 124, 815 P.2d 72, 83 (1991) (written personnel policy alone is not sufficient to establish an implied contract of employment of a term of specific duration); *Johnson v. National Beef Packing Co.*, 220 Kan. 52, 55, 551 P.2d 779 (1976); *see also Wulf v. City of Wichita*, 644 F.Supp. 1211, 1221–22 (D.Kan.1986), *aff'd in part, rev'd in part on other grounds*, 883 F.2d 842 (10th Cir.1989) (stating that the Kansas rule remains that an employment manual, that is only a unilateral expression of company policy and is not bargained for, cannot alone be the basis of an employment contract) (citations omitted); *Rouse v. Peoples Natural Gas Co.*, 605 F.Supp. 230, 232 (D.Kan.1985) (citing *Bahr v. Blue Cross of Kansas, Inc.*,

—— Kan.App.2d ——, 672 P.2d 1107 (Kan.Ct. App.1983)) (representations in an employment manual alone are insufficient to form the basis for an implied contract of employment). There is a distinct difference between a policy which a given employer might adopt and sincerely intend to follow, and normally does follow, and a binding contractual duty. An employer may adopt a policy to bring clarity, or predictability, or even a sense of fairness to the employment relationship without intending to be contractually bound by it.

Just as the law does not generally enforce every promise made, but only those which rise to the level of a contract, so, too, here, the issue in this case is not simply whether GM made statements to employees about employment policies which it generally lived up to. The issue is also not whether the plaintiffs subjectively and unilaterally expected GM always to live up to what was stated in the employment manual, rather, it is whether the objective manifestations of GM's intentions were that GM intended to be contractually bound by the terms of the employment manual to the extent that it ceded its right to treat the plaintiffs as at-will or month-to-month employees whose terms and conditions of employment were subject to change. Although the court has found that the language of the employment manual does not evidence contractual intent on its face, the inquiry does not stop there.

In order to determine the intent of the parties and to determine whether an implied-in-fact contract existed, the court applies the test set out above, originally established in *Allegri* and re-enunciated by the Kansas Supreme Court in *Morriss* and *Brown v. United Methodist Homes for the Aged*.[6] *See Brown*, 249 Kan. 124, 815 P.2d 72, 81 (citing *Morriss*, 738 P.2d at 848–49 quoting *Allegri*, 9 Kan.App.2d 659, 684 P.2d 1031, 1035). Each plaintiff's implied contract claim is examined individually, by considering all of the circumstances surrounding the employment relation between each employee and GM.

*1. James Berry*

■ Berry has failed to show by a preponderance of the evidence that he had an im-

---

**6.** This test was embodied in the court's jury instruction # 33.

plied contract with GM. For one, Berry acknowledged signing an employment agreement stating his status as a month-to-month employee and compensation statements which referred to that agreement. Although not determinative, the apparent existence of such an agreement substantially supports GM's claim that it did not intend to be bound by the manual.

Berry also read the disclaimer included in the GM manual, the language stating the manual was not a legal contract and was not intended to alter the month-to-month status of an employee, and is deemed to have had knowledge of it. In *Bullock v. Dillard Department Stores, Inc.*, 1992 WL 350229 (D.Kan. October 20, 1992), the court was called upon to examine a similar employment agreement and disclaimer, stating:

> This certification succeeds where the *Morriss* disclaimer failed—it was called to Bullock's personal attention. It is reasonable to assume and plaintiff does not dispute that the certification was brought to her personal attention because she signed it. Further the certification clearly evidences an unqualified intent to create an employment-at-will relationship.

1992 WL 350229 *3. Like the disclaimer in *Bullock*, the language of the GM employment manual evidences an unqualified intent on the part of GM to create a month-to-month relationship. Berry acknowledged that he was aware of all of the provisions in the manual, including the disclaimer. *See id.* at *2 (the act of bringing a disclaimer to the personal attention of an employee obviates any legitimate expectation on the part of the employee that an employment contract be formed).

Berry, as do all the plaintiffs, argues that the court may imply a contract based on GM's past practice of adhering to the policies set out in "Working With GM."[7] The court recognizes that parties may become contractually obligated by their nonverbal conduct as well as by their use of oral or written words. Thus GM's past practice is probative of its intent to be bound by the manual. *See Allegri*, 9 Kan.App.2d at 664, 684 P.2d 1031.

The court is not persuaded, however, that it can infer from past practice alone, that GM intended to relinquish the right to change the provisions of the manual or the policies affecting the treatment of employees. Berry has offered little evidence that GM intended to alter the month-to-month employment relationship and the non-binding nature of its provisions that is clearly and unmistakably evidenced by the language of the employment manual. *See Pegg v. General Motors Corp*, 785 F.Supp. 901, 908–9 (D.Kan.1992) (where the GM manual specified that the employees' employment relationship with GM was strictly month to month and that the relation could not be altered or amended by either the employee or a representative of GM, other alleged representations could not create an implied contract inconsistent with the month-to-month relationship).

There has been no evidence that GM affirmatively represented to Berry that the employment manual's criteria for reductions in personnel would be used in the downsizing. Moreover, Berry testified he was aware that GM had unilaterally changed its policies regarding seniority three times during his employment. Berry had only a unilateral expectation, a subjective belief, that the terms of the employment manual would be applied to the personnel selections for the move to Fairfax II. *See Hartig v. Safelite Glass Corp.*, 819 F.Supp. 1523, 1533 (D.Kan.1993) (citing *Harris v. Board of Public Utilities of Kansas City*, 757 F.Supp. 1185, 1190 (D.Kan. 1991) ("An expectation to remain employed as long as one performs the duties of his or her employment properly is a unilateral expectation and does not, by itself, create a

---

7. Plaintiffs argue that for strong public policy concerns, GM should not be permitted to make promises in its manual and then disregard the policy at a later time. It seems, however, better for an employee, at least absent such reliance as would invoke the protection of § 90 of the Restatement of Contracts 2d (which has not been argued by the plaintiffs here) that an employer adopt and generally follow policies even if they are not contractual in nature, rather than avoid certain policies altogether for fear of giving up the right to treat employees as working at will, or under some other defined status, or of being bound to those policies regardless of changing circumstances. Moreover, any decision to further liberalize Kansas' implied contract doctrine beyond its established scope is not for this court to undertake.

property interest in that employment. This is true even where that expectation is created by verbal or nonverbal communications of the employer")).

The court finds that there was no implied contract between Berry and GM. Because the court finds that there was no implied contract as a matter of fact, Berry was a month-to-month employee and had no legal right to be accorded any particular treatment set out in "Working With GM."

### 2. Michael Carter

Carter, like Berry, read the entire employment manual, and signed various compensation statements. He, too, is deemed to have had knowledge of the disclaimer and that his employment was described as being on a month-to-month basis. He never negotiated with GM for the terms of the manual, and it was his understanding that GM had the right to assign salaried personnel to various jobs without regard to corporate length of service. The court finds that there was no implied contract between Carter and GM. Thus, Carter was a month-to-month employee who had no legal right to be accorded any particular treatment set out in "Working With GM."

### 3. Richard Dold

■ Dold, like Berry and Carter, signed an employment agreement and a compensa-

tion statement that stated his employment was month to month. He also read the employment manual and is deemed to have read the language that stated it was not a contract. Dold did not negotiate for the terms of the manual.

No agent of GM ever made representations to Dold that the manual would be followed in the move to Fairfax II. The court recognizes, however, that GM made representations to Dold and other employees at the Kemper Arena meetings that no layoffs would be necessary and reductions would be accomplished by retirement and attrition alone. These statements may have given Dold and many other plaintiffs a false sense of security as to their future employment. Perhaps management initially intended that reductions be fully accomplished by retirement and by employees voluntarily leaving the company, but in the end this was clearly unrealistic.[8] The court finds, however, that GM did not represent that the manual would be followed and Dold simply assumed that it would be because of past practice, and that Dold had only a unilateral expectation that seniority would play a large role in the selections for Fairfax II.[9] Thus, the court finds, based on a preponderance of the evidence, that neither "Working With GM" nor statements made to Dold created an implied contract of employment with GM, and Dold had

8. The parties disagree, and it remains unclear, whether and to what extent certain policy provisions applied when there were "reductions" but "layoffs" were not contemplated. The court need not reach this issue because it finds that GM was not required to abide by the manual in any event.

The parties also dispute whether any plaintiff "voluntarily" chose to go back to hourly or take another position with GM. Although the choice was voluntary in the sense that each plaintiff decided which course of action to take, or made his or her own choice, the court recognizes they were compelled by the circumstances to make a choice, and had other options been offered, the plaintiffs might have reacted differently. The distinction is unimportant, however, for the issue is whether GM was impliedly obligated to offer the plaintiffs choices that ultimately were not offered and whether GM restricted its right to change the selection process previously stated in its manual. The court finds against plaintiffs on this dispositive question.

9. All plaintiffs argue that Beirne's testimony, which indicated that he felt obliged to follow the employment manual, leads inevitably to the conclusion that the manual was an implied contract. They argue that because evidence exists that GM management generally believed the manual should be followed, GM, *ipso facto*, intended to be bound. This court disagrees. Beirne's statements, although probative of an intent on the part of management to be bound contractually by the manual, are also consistent with the admitted intent on the part of GM to comply with the manual even though not legally obligated to do so. Beirne testified that the manual was followed when it could be, but that the extreme changes taking place during the downsizing was unprecedented, and, therefore, could not be covered by the manual. Moreover, GM policy was not dictated by Beirne, a single plant manager, but rather was set by a higher GM authority in Detroit. The court is not persuaded that Beirne's testimony mandates a conclusion that GM intended to be bound by the manual.

no legal right to be accorded any particular treatment set out in the manual.

### 4. Eugene Gold

Like Dold, Gold believed that representations at the Kemper Arena meetings that any reductions in personnel could be completed by retirement and attrition alone assured him a position at Fairfax II. The court finds that GM made no representations to Gold indicating that the employment manual would be followed or that seniority would determine the selection of employees, and concludes that Gold had only a unilateral expectation of continued employment in the same position at the new plant. Gold was also aware of the very clear terms of the manual which stated that it was not a legal contract and that it did not alter an employees' month-to-month status. Thus, the court finds that there was no implied contract of employment between Gold and GM which restricted GM's right to treat Gold as a month-to-month employee and Gold had no legal right to any particular treatment under the manual.

### 5. Lloyd Hendrix

Hendrix signed an employment agreement and compensation statements which described his employment as month to month. He never negotiated for the manual or for any changes in its terms and he was not aware of any salaried employees ever having done so. In 1986, GM unilaterally eliminated the cost of living adjustments for salaried employees, and Hendrix testified that to his knowledge there were no negotiations regarding this policy change. After examining all of the circumstances surrounding the employment relationship between Hendrix and GM, the court is not persuaded that an implied contract existed restricting GM's ability to treat Hendrix as a month-to-month employee and the court finds that he had no legal right to any particular treatment under the manual.

### 6. Ronald Walsh & Harold Scott

 While this court is bound to interpret employment contracts more broadly and recognize that an employer may impliedly restrict its right to terminate an employee by the enactment and adherence to certain policies, *Morriss,* 241 Kan. at 509, 738 P.2d 841, every employee manual will not automatically create an implied contract. *See Brown v. United Methodist Homes For Aged,* 249 Kan. 124, 815 P.2d 72, 83 (1991). Scott and Walsh are particularly hard-pressed to argue that the terms of "Working With GM" formed the basis of a mutual intent to contract, because they testified they never read the manual. *See Jacobson v. Roadway Exp., Inc.,* 1992 WL 176426 *3 (D.Kan. July 17, 1992). The court finds that their knowledge of policies in a general sense is insufficient evidence that there was a mutual intent to be bound by the terms of "Working With GM." No representations were made by GM that the manual would be followed, and neither plaintiff negotiated for its terms. Walsh signed compensation statements and an employment agreement that recognized the term of his employment as month-to-month. Scott expected that layoffs would be determined by seniority, yet he testified he was aware of circumstances in which GM did not use seniority as the standard. Once again, these plaintiffs had only a unilateral expectation that GM would continue to follow past practice. Thus, based on all the circumstances surrounding the employment relation between these plaintiffs and GM, the court finds that no implied contract existed and neither Scott nor Walsh had a legal right to be accorded any particular treatment set out in the manual.

### 7. Robert King

Like many of the other plaintiffs, King acknowledged that he never negotiated for the terms of the employment manual or any changes in policy, and further, that he was aware of instances in which GM unilaterally changed the terms of the manual during the course of his employment. King read the manual and understood the clear language to the effect that the manual was not intended to modify the month-to-month employment relationship. The court finds, based on all the circumstances surrounding King's employment relationship with GM, that there was no implied contract between GM and

King and he had no legal right to any particular treatment set out in the manual.

### 8. George Simpson

Simpson read working with GM and was aware of the provision that stated the manual did not create a legal contract, and acknowledged he signed an employment agreement that contained the month-to-month language. He also acknowledged that the agreement stated that he would devote his time and service in the employ of GM in such capacity as GM might direct. No one at GM ever told Simpson that the employment manual would be followed during the downsizing, but Simpson believed past practice was to consider seniority when determining layoffs. The court finds, based on all the circumstances surrounding the employment relationship between Simpson and GM, that there was no implied contract and he had no legal right to any particular treatment set out in the manual.

### 9. Linda Howell

Howell regularly received "Working With GM" booklets, reviewed them in their entirety, and was specifically aware of the language that indicated the manual was not a legal contract. She never negotiated for any terms of the manual. No GM representative ever told Howell that the manual would be used, and in fact, Howell was specifically told by Danahy that decisions with respect to changes in the personnel department would not be made on the basis of length of service. Based on all of the circumstances surrounding Howell's employment relationship with GM, the court finds there was no implied contract, and that Howell was a month-to-month employee with no legal right to be accorded any particular treatment set out in "Working With GM."

### 10. Richard McCauley

McCauley has offered little evidence of mutual assent to be bound by the terms of "Working With GM." He testified that he expected to be transferred because he saw a seating chart that indicated he would go to Fairfax II. The court finds that McCauley had no more than a unilateral expectation that GM would conduct selections according to the terms of the manual and that he had no legal right to any particular treatment mentioned in "Working With GM."

### 11. Bernard Hurt

Hurt read the employment manual and is deemed to have read the portion of it that declares that it is not a legal contract and that it does not modify the month-to-month employment relationship. Hurt never negotiated for the terms of the manual. Moreover, Hurt testified that he knew of nothing in the policies of GM that prohibited him from leaving his job at any time or prohibited GM from letting him go at any time. The court finds that no implied contract existed between Hurt and GM, and, thus, Hurt was a month-to-month employee who had no legal right to be accorded any particular treatment set out in "Working With GM."

### B. Race Discrimination Claim

■ Title VII prohibits employers from discriminating in the work force on the basis of race, color, religion, sex, or national origin. 42 U.S.C. §§ 2000e–1 to 2000e–17. Plaintiff Berry alleges that GM discriminated on the basis of race when it decided not to select him for a position as supervisor at Fairfax II.[10] In order to establish this claim, Berry must prove by a preponderance of the evidence that the defendant had a discriminatory motive in making its employment decision. *See Ortega v. Safeway Stores, Inc.,* 943 F.2d 1230, 1236 (10th Cir.1991).

Because discrimination is frequently difficult to prove by direct evidence, the courts have established an analytical framework by which circumstantial evidence of discrimination may be examined. Under the shifting burden of proof scheme established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and modified by *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), the plaintiff

---

**10.** This court held at trial that plaintiffs Scott and Gold had not met their burden to show race discrimination as a matter of law and these claims were not submitted to the jury.

bears the initial burden of establishing a prima facie case of discrimination. The burden then shifts to the defendant to come forward with a legitimate, nondiscriminatory reason for its actions. *Drake v. City of Fort Collins,* 927 F.2d 1156, 1160 (10th Cir.1991). The plaintiff must then show that the reason articulated by the defendant is merely a pretext for discrimination. *MacDonald v. Eastern Wyoming Mental Health Center,* 941 F.2d 1115, 1119 (10th Cir.1991).

The burden of persuasion to prove intentional discrimination ultimately rests with the plaintiff. *St. Mary's Honor Center v. Hicks,* — U.S. ——, 113 S.Ct. 2742, 2753, 125 L.Ed.2d 407 (1993); *E.E.O.C. v. Flasher Co., Inc.,* 986 F.2d 1312, 1316 (10th Cir.1992). In the final analysis, at trial the court is required to weigh all the evidence and to assess the credibility of witnesses in order to determine whether the plaintiff was the victim of intentional discrimination based upon race. *See U.S. Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 715–16, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *Pullman–Standard v. Swint,* 456 U.S. 273, 286–88, 102 S.Ct. 1781, 1788–89, 72 L.Ed.2d 66 (1982); *Pitre v. Western Electric Co.,* 843 F.2d 1262, 1266 (10th Cir.1988).

Berry easily states a prima facie case of race discrimination. GM, in response, has thoroughly articulated a non-discriminatory reason for not selecting him. Neece, the Superintendent of the body shop stated that he based his selections on the following criteria: experience; self-starter capabilities; ability to work with people; trustworthiness; compatibility with the team concept; and demonstrated performance. Thus, the burden rests with Berry to persuade the court by a preponderance of the evidence that GM intentionally discriminated against him. "[O]nce the defendant has responded to the plaintiff's prima facie case, 'the district court has before it all the evidence it needs to decide' ... 'whether the defendant intentionally discriminated against the plaintiff.'" *Hicks,* — U.S. at ——, 113 S.Ct. at 2753–54 (citing *Aikens,* 460 U.S. at 715, 103 S.Ct. at 1482).

Berry has produced evidence that Carpenter, the shift Superintendent, and other seventh-level general supervisors, made derogatory references as to his race and abilities over a substantial period of time. The court recognizes that there was a potential for discrimination in this environment. However, the ultimate decision not to hire Berry was made by Neece. After applying the criteria set out above, and based on his knowledge and observation of all employees in the body shop, Neece prepared a list of sixth-level supervisors, ranked from most qualified to least qualified. He ranked Berry at the bottom of this list. Without revealing the ranking, Neece then asked for input from Carpenter and other members of the staff to whom Berry refers as racially biased. Thus, Neece made an independent evaluation before consulting with these men. Neece's choices were then approved by Art Hester, an African–American who was the Production Manager, and Beirne, the Plant Manager.

The court finds that Neece's evaluation did not include race as a factor. His decision and its subsequent approval by two other GM managers was not tainted by the potentially biased opinions of some of the lower-level supervisors. After weighing all the evidence at trial, and considering closely the demeanor and testimony of particular witnesses, the court finds that Berry has not persuaded the court by a preponderance of the evidence that GM discriminated against him based on his race in its decision not to select him for a position as supervisor at Fairfax II.

### C. Retaliation Claims

Title VII also proscribes retaliation by an employer against an employee for filing a complaint with the Equal Employment Opportunity Commission ("EEOC"). 42 U.S.C. § 2000e–3(a). Plaintiffs Hurt and Howell claim that GM took retaliatory action against them for filing complaints with the EEOC.

The *McDonnell Douglas* shifting burden of proof scheme applies to retaliation claims under Title VII. The prima facie requirements for a showing of retaliation are (1) employee participation in a Title VII proceeding; (2) adverse action by the employer

after or during the employee's participation; and (3) a causal connection between the employer's action and the employee's participation. *Boyd v. Telecable of Overland Park, Inc.,* 752 F.Supp. 388, 394 (D.Kan.1990). "If a prima facie case is established, then the burden of production shifts to the defendant to produce a legitimate, nondiscriminatory reason for the adverse action. If evidence of a legitimate reason is produced, the plaintiff may still prevail if she demonstrates the articulated reason was a mere pretext for discrimination. The overall burden of persuasion remains on the plaintiff." *Sauers v. Salt Lake County,* 1 F.3d 1122, 1128 (10th Cir.1993) (citing *Sorensen v. City of Aurora,* 984 F.2d 349, 353 (10th Cir.1993)).

### 1. Linda Howell

■ Howell claims that GM retaliated against her for filing a discrimination claim by denying her a lump sum bonus, changing her hours upon assignment to a new plant, denying her remaining vacation time, or by reassigning her to security as a patrol guard. These actions took place a short time after Howell signed a second complaint with the EEOC. The court finds that Howell has established a prima facie case of retaliation. *See Burrus v. United Telephone Co.,* 683 F.2d 339, 343 (10th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982) (protected conduct closely followed by adverse action can demonstrate a causal connection).

GM, however, has provided nondiscriminatory reasons for its employment actions against Howell. Clark, Danahy, and Schmer all participated in the decision not to include Howell in the personnel department at Fairfax II, and did so based on the fact that it was her specific position that was eliminated. Howell was a specialized clerk in the benefits section, and at the time reductions were made, benefits functions were being centralized in the Detroit area. Howell was not offered one of the remaining specialized clerk positions at Fairfax II. However, instead of terminating Howell's employment altogether, GM transferred her to other departments and assigned her new duties. Howell was not offered one of the specialized clerk positions at Fairfax II because other clerks were deemed more qualified.

The court does not find that GM's articulated reasons for moving Howell to different duties are a mere pretext for retaliation. Howell acknowledged that her belief that she was retaliated against for filing a complaint with the EEOC, by not receiving a recognition award, not getting her vacation days, and being switched to security, was based solely on the fact that she filed a charge and did not receive these benefits. Other employees, however, were assigned to various duties, and were demoted, as a result of the downsizing. Individuals who had not filed charges were treated similarly in terms of change of assignment and work hours. Although she did not receive her vacation days when she wanted, GM paid her for them. Other individuals who had not filed charges were not allowed to take requested vacation time. Moreover, Howell had never received a recognition award before she filed her discrimination claim, so whether she was denied such an award because of the filing is speculative at best. Howell has not met her burden to show by a preponderance of the evidence that GM's employment decisions were in retaliation of her filing of discrimination claims. *See Hicks,* —— U.S. at ——, 113 S.Ct. at 2753; *Flasher Co.,* 986 F.2d at 1316.

### 2. Bernard Hurt

■ Hurt has also established a prima facie case of retaliation in that he has proved that he filed a discrimination claim in April of 1987 and that GM took adverse employment action against him by refusing to transfer him to the new facility shortly thereafter. He too, however, has not persuaded the court by a preponderance of the evidence that GM's articulated and substantiated reasons for its decisions are a mere pretext for retaliatory action. *See Hicks,* —— U.S. at ——, 113 S.Ct. at 2753.

The credible testimony of Dooley, the director of the Quality/Reliability organization, indicated that he did not select Hurt because he believed: (1) Hurt waited for problems to be reported, rather than show initiative and anticipate them; (2) Hurt was perceived as a "whistle-splitter," someone who stopped

working when the whistle blew; and (3) Hurt needed improvements in his communication skills. Dooley testified that he was not aware of the EEOC complaint at the time he made the staffing decisions for Fairfax II. Dooley considered Hurt a good employee, but felt that his demonstrated performance was not as strong as others in the organization. Hurt presented no evidence which undercuts GM's explanation for why it treated Hurt as it did. The court finds that Hurt has not met his burden to show by a preponderance of the evidence that the employment decisions in question were in retaliation for his filing a discrimination claim. *See Hicks,* —— U.S. at ——, 113 S.Ct. at 2753; *Flasher Co.,* 986 F.2d at 1316.

### D. Age Discrimination Claims

█ The Age Discrimination in Employment Act ("ADEA") prohibits an employer from discriminating against an employee with respect to his or her compensation, terms, conditions, or privileges of employment based on the individual's age. 29 U.S.C. § 623(a)(1). Under ADEA, a plaintiff is required to prove that age was the determining factor in the decision adversely affecting him. *E.E.O.C. v. Sperry Corp.* 852 F.2d 503, 507 (10th Cir.1988); *Perrell v. FinanceAmerica Corp.,* 726 F.2d 654, 656 (10th Cir.1984). A plaintiff need not prove that age was the sole reason for the adverse treatment, but must show that it "made the difference" in the employer's decision. *Sperry Corp.,* 852 F.2d at 507; *EEOC v. Prudential Federal Savings & Loan Ass'n,* 763 F.2d 1166, 1170 (10th Cir.), *cert. denied,* 474 U.S. 946, 106 S.Ct. 312, 88 L.Ed.2d 289 (1985).

█ The burden-shifting analysis outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) for discrimination claims applies to claims under ADEA. *See Branson v. Price River Coal Co.,* 853 F.2d 768, 770 (10th Cir. 1988); *Cooper v. Asplundh Tree Expert Co.,* 836 F.2d 1544, 1547 (10th Cir.1988). A plaintiff must present a prima facie case of employment discrimination by showing that he or she: (1) is within the protected age group;

(2) was doing satisfactory work; (3) was discharged despite the adequacy of this work; and (4) was replaced by a younger person. *Cockrell v. Boise Cascade Co.,* 781 F.2d 173, 177 (10th Cir.1986). In reduction cases, plaintiffs are incapable of proving actual replacement, so courts have modified the fourth element by requiring a plaintiff to "produce evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." *Branson,* 853 F.2d at 771 (citing *Williams v. General Motors Corp.,* 656 F.2d 120, 129 (5th Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1439, 71 L.Ed.2d 655 (1982)).

█ Once a plaintiff establishes a prima facie case, the defendant has the burden to articulate a legitimate, nondiscriminatory reason for the treatment of the plaintiff. *Cockrell,* 781 F.2d at 177. The burden of persuasion then remains with the plaintiff to demonstrate that the defendant's explanation is a mere pretext for what is actually unlawful age discrimination. *Id.*

Plaintiffs Berry, Gold, Hurt, Howell and McCauley allege discrimination on the basis of age. The court finds that these plaintiffs have failed to persuade the court by a preponderance of the evidence that age was the determinative factor in GM's decisions regarding Fairfax II.

### 1. James Berry [11]

█ Berry has proved that he is over forty, was doing competent work for GM and that some younger people were treated more favorably than he; therefore, Berry has established a prima facie case of age discrimination. Berry, however, has failed to persuade the court, as he is required to do, that age was a determinative factor in GM's decision not to select him for Fairfax II. *See St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2753, 125 L.Ed.2d 407 (1993).

As set out above, GM has demonstrated legitimate nondiscriminatory reasons for the decisions made regarding Berry. Evidence

---

11. Berry, upon advice of counsel, decided not to pursue his age discrimination claim in his post-

trial brief. Nonetheless, the court analyzes that claim here.

that Holek, an acting superintendent, told Berry GM was leaning toward a younger work force is not sufficient to persuade the court that Neece used age as a criterion in his ranking and selection of employees. *See Guthrie v. Tifco Industries,* 941 F.2d 374, 378–79. (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1267, 117 L.Ed.2d 495 (1992); *Gagne v. Northwestern Nat'l Ins. Co.* 881 F.2d 309, 314 (6th Cir.1989) (evidence that the defendant supervisor stated that. they "needed younger blood" was insufficient to infer discrimination). ·

### 2. Eugene Gold

■ Gold has established a prima facie case of discrimination. GM, on the other hand, has articulated a non-discriminatory purpose for its decision: Gold was not as proficient at his job as his peers, he was not as good as his peers in coordinating among shifts and he was not a self-starter. GM has also shown that eight employees out of twelve at Fairfax II in Hard Trim were over forty years old. Gold has not persuaded the court that GM's reasons are a mere pretext for discrimination based upon age and has not met his burden to persuade the court by a preponderance of the evidence that age was a determinative factor.

### 3. Bernard Hurt

■ Hurt has established a prima facie case of age discrimination in that he is over forty years old, his performance at GM was rated as "highly effective" by the then existing system, he was qualified for the position at Fairfax II, and some younger employees were treated more favorably in the transfer. GM, however, has proved that Hurt was not chosen because it believed other reliability engineers were better performers, related better to people, and worked better in a cooperative environment.

■ Hurt has emphasized the fact that he was extremely qualified and was even due for a promotion. GM, however, was faced with the dilemma of choosing between many very qualified employees. Discriminatory intent is not necessarily inferred when one of many qualified employees is not chosen. *See Hooks v. Diamond Crystal Specialty Foods,*

*Inc.,* 997 F.2d 793, 798 (10th Cir.1993). Hurt also argues that individuals who were younger than he were chosen for Fairfax II. ADEA, however, was not intended to force employers to grant special treatment to older employees, nor does it impose a duty on employers to retain older employees. *E.E.O.C v. Sperry Corp.,* 852 F.2d 503, 509 (10th Cir.1988). Hurt's supervisor, Hightower, made remarks that indicated GM needed younger people for the new plant. However, in light of the fact that Dooley ultimately made the selections for Fairfax II, the court finds that these general remarks are insufficient to persuade it that Hurt's age motivated GM. The court is not persuaded, by a preponderance of the evidence submitted, that GM discriminated against Hurt when it made the decision not to assign him a position as a fifth-level reliability engineer at Fairfax ·II. ·

### 4. Linda Howell

■ Howell has established a prima facie case of discrimination in that she has shown she was forty-one at the time of the move to Fairfax II, she was sufficiently qualified and competent to retain her position in the new plant, and some younger employees were treated more favorably than she. Despite the fact that there is some evidence from which the court might infer discrimination, the court is not persuaded that age, in fact, motivated the decision that she be excluded from a relatively equivalent position at Fairfax II. GM offered direct credible evidence that age was not a consideration when Howell's position was eliminated. Danahy, the Personnel Director, testified that Howell was ranked fifth out of six specialized clerks, and that only four would be taken to Fairfax II. Although Howell was competent and qualified for a position at Fairfax II, Danahy considered other employees better qualified. The oldest employee in a specialized clerk position was chosen for Fairfax II. Clark, the Supervisor of Employment, testified she tried to find a position for Howell at other plants in other states, but Howell was not interested. Howell testified that the only reason she believed age was a factor in GM's

decision not to select her was that younger people were selected and she was not.

Howell has not persuaded the court that age was a factor in the decision made by Howell's superiors in their staffing decisions for the personnel department at Fairfax II.

### 5. Richard McCauley [12]

■■■ McCauley has also stated a prima facie case of age discrimination, but, the court is not persuaded that age was a determinative factor in his nonselection. At Fairfax I, in May of 1987, there were five materials schedulers over the age of forty, but no one in that position below the age of forty. Two employees from the department, both over the age of forty, were chosen for Fairfax II. McCauley was the youngest of the material schedulers in the material department, having just turned 40. The oldest employee in McCauley's classification and department was one of the employees selected to be assigned to the material department at Fairfax II. Holsapple, the director of the department and person making staffing decisions for the new plant, testified that age was not a factor in the selection process. The court finds and concludes that McCauley's age was not a factor in the staffing decisions made.

### III. Conclusion

The American economy has undergone jolts over the last decade or more which have led to business restructuring and to wholesale loss of jobs by a category of worker typically unaffected by traditional economic ups and downs. Good, hard-working employees, like the plaintiffs here, have been the unfortunate victims of a system which has not, in these times, always lived up to its former prospects of ever improving incomes and life styles. That they are not alone, or that they may be blameless casualties, is no solace to these plaintiffs or their families. Yet, the larger issues are not before this court. This case, for all its perceived complexity and all its human drama, turns on relatively straight-forward evidence. None of the plaintiffs has proved an implied con-

tract with the defendant which would entitle any of them, as a matter of law, to treatment different than received, nor have any of the complaining plaintiffs established that this treatment was the product of discrimination.

**IT IS THEREFORE ORDERED BY THE COURT** that all plaintiffs are denied relief for breach of an implied contract against defendant General Motors, and the clerk is directed to enter judgment in favor of the defendant on all implied contract claims.

**IT IS FURTHER ORDERED** that plaintiff Berry's claim for relief for discrimination on the basis of race is denied, and the clerk is directed to enter judgment in favor of the defendant General Motors on this claim.

**IT IS FURTHER ORDERED** that the claims of plaintiffs Berry, Gold, Hurt, Howell and McCauley for relief from discrimination on the basis of age are denied, and the clerk is directed to enter judgment in favor of the defendant General Motors on these claims.

**IT IS FURTHER ORDERED** that the claims of plaintiffs Hurt and Howell for relief for retaliatory discharge against the defendant General Motors are denied, and the clerk is directed to enter judgment in favor of the defendant on these claims.

**IT IS SO ORDERED.**

---

**12.** McCauley, like Berry, decided not to pursue his age discrimination claim in his post-trial brief, but the court believes analysis of this claim,

also, is appropriate for completeness of the record.